[Cite as *State v. Collins*, 2020-Ohio-3126.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                          :

     Plaintiff-Appellee,                       :

                                 No. 19AP-373

v.                                                          :          (C.P.C. No. 18CR-2682)

Kiez D. Collins,                                       :          (REGULAR CALENDAR)

     Defendant-Appellant.                      :

---

D E C I S I O N

Rendered on May 28, 2020

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton*, for appellee.

**On brief:** *Bellinger & Donahue*, and *Kerry M. Donahue*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Defendant-appellant, Kiez D. Collins, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which he was convicted of two counts of murder. Finding no merit to the appeal, we affirm.

{¶ 2} On June 4, 2018, appellant was indicted on one count of aggravated robbery in violation of R.C. 2911.01 (Count 1), two counts of aggravated murder in violation of R.C. 2903.01 (Counts 2 and 3), and two counts of murder in violation of R.C. 2903.02 (Counts

4 and 5). Each count included a three-year firearm specification pursuant to R.C. 2941.145. The indictment arose out of the shooting death of DeSean Bonet on May 26, 2018.

{¶ 3}    The matter proceeded to a jury trial in May 2019, at which the state presented the following pertinent evidence.  Commencing at approximately 4:30 a.m. on May 26, 2018, the Columbus Division of Police received a series of three anonymous 911 calls regarding a shooting near the intersection of Wilson Avenue and East Deshler Avenue. Plaintiff-appellee, State of Ohio, did not provide a transcript of the 911 calls; however, audio from each of the three calls was played for the jury.  The first and second callers reported hearing three or four gunshots, followed by the sound of a man moaning; neither caller had seen anyone in the area.  The third caller reported that he heard one or two gunshots and saw a young black man running down the street; the man eventually fell to the ground.  The caller averred that he did not know who had fired the shots.

{¶ 4}    Within minutes of the 911 calls, Officer Joshua Watson was dispatched to the scene.  Upon arrival, Officer Watson observed a man, later identified as Bonet, lying on his back in the grassy area between the sidewalk and the street just north of the Wilson/East Deshler intersection.  Bonet had blood around his nose and mouth; he was immobile and not breathing.  Officer Watson observed two spent shell casings in the street, approximately 15 to 25 feet from Bonet's body.  He did not see any weapons or narcotics in the area.

{¶ 5}    Detective Lowell Titus arrived at the scene at approximately 5:30 a.m.  He observed two spent shell casings in the street as well as blood on a nearby curb and in the grass.  He further noted that a residence located at 1263 Wilson Avenue, just south of the Wilson/East Deshler intersection, had a video surveillance camera mounted on the front porch.  In addition, he observed several broken items on the front porch of a residence located at 1267 Wilson Avenue.

{¶ 6}    Detectives Raymond Guman and Mark Burghart took numerous still photographs of the crime scene, including the interior and exterior of 1267 Wilson Avenue. Among other things, the photographs depict the sidewalk and three concrete steps leading to the front porch.  Interior photographs of the living room depict a small, semiautomatic handgun with an inserted magazine hidden behind several items on the fireplace mantel. The firearm had one live round in the chamber and two live rounds in the magazine.  The

photographs also depict a clear plastic baggie containing a "green leafy substance" on a shelf in the living room. (May 14, 2019 Tr. at 299.)

{¶ 7} Shortly after the incident, Detective Jennifer Gribi interviewed several people in the neighborhood, including a man who lived at 1267 Wilson Avenue. The man identified himself as Tom Collins and provided a date of birth. She later learned that the man's name was Kiez Collins and that he had admitted to other detectives that he had provided her with a false name and date of birth.

{¶ 8} Lindsay Brokaw testified that she lived at 1263 Wilson Avenue, two doors north of 1267 Wilson Avenue. At approximately 4:30 a.m. on May 26, 2018, she awoke to the sound of gunshots. She looked outside, saw nothing unusual, and returned to bed. Ten to fifteen minutes later, she awoke to police lights in the neighborhood. Soon thereafter, police officers knocked on her door and asked if she had seen anything. She told the officers that she had viewed video footage recovered from a security camera mounted at the top left corner of her porch. The officers viewed approximately ten minutes of the footage from Brokaw's phone. They later retrieved it from her computer. During Brokaw's testimony, the state played the video footage for the jury. Brokaw identified the video footage as that retrieved from her security camera. Although she knew appellant from the neighborhood, she could not identify him in the video footage.

{¶ 9} The video footage does not capture the front porch of 1267 Wilson Avenue. The footage depicts a young, black male, later identified as Bonet, running northbound on Wilson Avenue toward the East Deshler intersection. Almost simultaneous with Bonet's appearance in the camera view, two gunshots are heard. Bonet continues to run northbound, away from 1267 Wilson Avenue. Moments later, another man, later identified as appellant, appears in the frame. Appellant chases Bonet down the street and fires two shots in quick succession. Bonet then falls to the ground on the northeast side of the intersection. Bonet can be heard saying, "you got it, you got it" followed by an expletive. (State's Ex. A.) Appellant approaches Bonet, picks up something from the ground near where Bonet fell, and walks south on Wilson Avenue.

{¶ 10} Appellant was eventually arrested. Pursuant to the arrest, the police swabbed appellant's hands for gunshot residue. A forensic scientist from the Ohio Bureau of Criminal Identification and Investigation tested the swabs and found the presence of

gunshot residue on appellant's hands. A forensic scientist from the Columbus Police Crime Laboratory examined the handgun recovered from 1267 Wilson Avenue and determined that it was operable. Comparison of the spent cartridge cases and bullets recovered from the crime scene to test cartridge cases and bullets fired from the recovered handgun proved inconclusive as to whether the examined items had been fired from the same weapon.

{¶ 11} Franklin County Deputy Coroner Donald Pojman, M.D., performed an autopsy on Bonet on May 27, 2018 and prepared a report of his findings. That report indicates that Bonet sustained three penetrating[1] gunshots wounds, one to the chest on the "right side of the mid back," one to the pelvis "on the left buttock," and one to the left lower leg. (State's Ex. G.) The report further states that the bullet to the chest travelled from "back to front, upwards and slightly right to left," the bullet to the pelvis travelled from "back to front and left to right," and the bullet to the leg travelled from "back to front and upward." *Id.* Dr. Pojman's report lists Bonet's cause of death as "[g]unshot wounds of the torso" and the manner of death as homicide. *Id.*

{¶ 12} The court called John Watson, Jr., as its own witness pursuant to subpoena. During the state's examination, Watson testified that on May 26, 2018, he lived across the street from 1261-1263 Wilson Avenue. He knew appellant casually from the neighborhood. Because it was warm outside, the windows in his house were open. Sometime before 4:30 a.m., he heard appellant say, "[m]an, where's my shit at?" (May 15, 2019 Tr. at 470.) A man Watson did not know responded, "[c]hill out. Chill out. I don't know what you're talking about." *Id.* Watson observed appellant "steadily approaching" the man, who was walking backward on Wilson Avenue toward East Deshler Avenue. *Id.* Appellant repeatedly asked the man "[w]here's my shit at." *Id.* at 474. The man repeatedly responded "[c]hill out. I don't know. I don't know what you're talking about." *Id.* The man eventually bumped into a car that was parked on Wilson Avenue; appellant pulled out a pistol and shot the man two times. Watson saw the man take two or three steps and then fall to the ground. Appellant then looked at his cell phone, put his gun in his pocket, and walked toward his house; he eventually ran between two houses. Watson testified that he was interviewed by the police after the incident and reported what he had seen.

---

[1] Dr. Pojman defined a "penetrating gunshot" as one where "the bullet enters the body but does not leave the body." (May 15, 2019 Tr. at 436.)

{¶ 13} During his examination of Watson, defense counsel played the video footage obtained from Brokaw's security camera. Watson acknowledged that what was depicted on the video footage was somewhat inconsistent with the testimony he provided during the state's questioning. In particular, Watson noted that the video footage establishes that four shots were fired, not two. When asked to explain this discrepancy, Watson averred "I might have heard the last two shots, but I didn't hear the first two shots." *Id.* at 488.

{¶ 14} At the conclusion of the state's case-in-chief, defense counsel made a Crim.R. 29 motion for judgment of acquittal. The trial court granted the motion as to Counts 1 and 2, dismissed those counts, and denied the motion as to Counts 3, 4, and 5.

{¶ 15} Cameran Thompson testified in appellant's case. Thompson acknowledged that he was a convicted felon and was currently on probation. He averred that he had known appellant for several years and considered him to be "like a brother." (Tr. at 519.) Although he had known Bonet for a couple of years, the two men were not close friends.

{¶ 16} On May 26, 2018, several people, including Bonet and a man named Drako, were hanging out at Thompson's house. At some point, the group began discussing a plan to rob appellant of the marijuana they knew he sold from his home. Thompson objected to the planned robbery because he knew that appellant kept only a small amount of marijuana at his house. However, he did not attempt to warn appellant because he did not believe the group would carry out the plan.

{¶ 17} Appellant testified that on May 26, 2018, he lived with his mother at 1267 Wilson Avenue. He worked temporary warehouse jobs and sold small amounts of marijuana to family and friends. At approximately 4:00 a.m. on May 26, 2018, appellant made plans to sell marijuana to a friend named Drako, who was to meet appellant at his house. Appellant sat on the front porch waiting for Drako to arrive; he did not lock the front door when he exited the house. He had a loaded firearm in his left pocket for protection because his mother recently had been attacked in their home.

{¶ 18} A man he did not recognize (Bonet) approached and asked if he knew where he could get some marijuana. Appellant was "leery" of Bonet because he was a stranger and it was 4:00 a.m. *Id.* at 542-43. Appellant noticed that Bonet had his right hand in his pocket. He was afraid that Bonet might rob him and enter the house. Appellant told Bonet that his friend was coming to buy all the marijuana he had but that the friend might be

willing to sell him part of what he bought from appellant. He also told Bonet to come back another time. Bonet then asked appellant if he could see the marijuana. Appellant handed him the marijuana, which was in a clear plastic baggie. Bonet looked at it, smelled it, and then returned it to appellant. Appellant put the marijuana in his pocket.

{¶ 19} Almost immediately thereafter, Bonet pushed appellant against the front door and grabbed the marijuana from appellant's pocket. Appellant testified that at this point, he was "in fear of [his] life." *Id.* at 544. He felt he had no means of escape; he could not physically overpower Bonet nor run inside the house or around the side of the house. He was "nervous" and "excited" and "scared" because Bonet still had his hand in his pocket. *Id.* at 545. At this point, appellant reached into his pocket and slid the safety off his gun. When Bonet "started turning a little bit," appellant saw this as "my window of opportunity to pull out the gun and fire." *Id.* Appellant testified "[t]hat's when I fired, and [Bonet] took off running. I started firing towards the ground, like, to try to get him away so I could run back inside my house and call the police." *Id.* Bonet started running north toward East Deshler Avenue. Afraid that Bonet would turn around and shoot at him "because * * * I had shot at him," appellant fired three more shots in an effort to "get [Bonet] at least to the other side of Deshler, far enough for me to run back up through the middle of the houses and back inside the house through the back." *Id.* at 547. Appellant did not realize how many shots he had fired because he "just reacted" to a "life-or-death situation." *Id.* He was "so scared" and believed it "was either act or something might happen to me." *Id.*

{¶ 20} Once Bonet fell to the ground, appellant stopped shooting because he no longer felt Bonet posed a threat to him. Indeed, after appellant fired the last two shots, Bonet said "[y]ou got it. You got it." *Id.* at 548. Appellant interpreted this statement to mean that Bonet had "surrendered and maybe he didn't have a gun or maybe it just wasn't loaded or anything and he dropped it." *Id.* Appellant walked toward Bonet, stopped one or two feet from where he lay on the ground, picked up the baggie of marijuana Bonet had taken from him, and started walking toward his house. He turned around to see if Bonet was still on the ground. When he saw that he was, he became concerned that Bonet had been hit by one of the shots he had fired. Appellant ran to his house, locked both doors, and called 911. He did not provide his name or indicate that he had shot Bonet. Appellant denied that he chased Bonet down the street in order to retrieve the marijuana.

{¶ 21} On cross-examination, appellant admitted that he intentionally fired his weapon four times in Bonet's direction; however, he denied that he was trying to shoot him. Rather, he "was trying to shoot near him to scare him off with the gunshots." *Id.* at 561. He acknowledged that Bonet ran away once appellant started shooting; however, because he was still afraid that Bonet might kill him, he chased him down the street and continued shooting in Bonet's "general direction." *Id.* at 562. Appellant stated that he "was trying to shoot at the ground by him but not directly at him." *Id.* at 563.

{¶ 22} Appellant further admitted that he lied numerous times during his interview with Detective Gribi, including providing a false name and date of birth and stating that he left his house only after hearing one or two gunshots. He denied that he lied to Detective Gribi when he said he did not know Bonet had been shot, as, at the time, Bonet was on his back and, because it was dark, he could not see the gunshot wounds or any blood. Appellant acknowledged that after he was taken into custody, he admitted to the police that he "didn't know if [Bonet] had a gun or not." *Id.* at 571.

{¶ 23} At the close of all the evidence, appellant renewed his Crim.R. 29 motion for judgment of acquittal as to Counts 3, 4, and 5. The trial court reserved its ruling as to Count 3 but overruled the motion as to Counts 4 and 5.

{¶ 24} Following deliberations, the jury returned verdicts finding appellant guilty of Count 4 (purposeful murder)[2] and Count 5 (felony murder)[3] and the attached firearm specifications but not guilty of Count 3 (aggravated murder).

{¶ 25} At a sentencing hearing held immediately after the jury returned its verdicts, defense counsel made a motion for judgment of acquittal pursuant to Crim.R. 29(C) on Counts 4 and 5; the trial court denied the motion. The trial court merged Counts 4 and 5 for purposes of sentencing. In accordance with the state's election, the trial court sentenced appellant on Count 4. The court imposed a prison sentence of 15 years to life on Count 4,

---

[2] Purposeful murder as charged in Count 4 is proscribed by R.C. 2903.02(A), which provides in relevant part that "[n]o person shall purposely cause the death of another."

[3] Felony murder as charged in Count 5 is prohibited by R.C. 2903.02(B), which states in relevant part that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 [voluntary manslaughter] or 2903.04 [involuntary manslaughter] of the Revised Code." The underlying offense of violence supporting Count 5 was felonious assault in violation of R.C. 2903.11, a second-degree felony.

to be served consecutive to the three-year term of imprisonment mandated by R.C. 2941.145, for a total prison sentence of 18 years to life. The court memorialized the conviction and sentence in a judgment entry filed on May 21, 2019.

{¶ 26} In a timely appeal, appellant advances the following three assignments of error:

> [I]. It was error for the lower court to fail to instruct the jury on the defense of self defense though requested by defense.
>
> [II]. It was error for the court to refuse to instruct the jury on the "castle" doctrine.
>
> [III]. It was ineffective assistance of counsel to allow continued use of the word victim by the state and its witnesses and fail to request an instruction on voluntary manslaughter.

{¶ 27} Appellant's first and second assignments of error are interrelated and will be considered together. Appellant contends that the trial court erred in refusing to instruct the jury on self-defense and the castle doctrine. Appellant contends that he presented sufficient evidence, through his own testimony and that provided by Thompson, to merit a self-defense instruction. Regarding the castle doctrine, appellant contends the trial court "wrongly believed the Defendant-Appellant had a duty to retreat if he had a reasonable means of escape from the danger other than by the use of deadly force." (Appellant's Brief at 23.)

{¶ 28} Generally, requested jury instructions should be provided " 'if they are correct statements of the law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction.' " *State v. Kean*, 10th Dist. No. 17AP-427, 2019-Ohio-1171, ¶ 43, quoting *State v. Adams,* 144 Ohio St.3d 429, 2015-Ohio-3594, ¶ 240. However, "a court need not instruct the jury as a party requests if 'the evidence adduced at trial is legally insufficient' to support it." *State v. Juntunen*, 10th Dist. No. 09AP-1108, 2010-Ohio-5625, ¶ 13, quoting *State v. Barnd*, 85 Ohio App.3d 254, 259 (3d Dist.1993). *See also State v. Stewart,* 10th Dist. No. 12AP-527, 2013-Ohio-1463, ¶ 10 ("A trial court is not required to instruct a jury on an affirmative defense when the evidence is insufficient to support the instruction."). Ultimately, "[t]he trial court possesses the discretion 'to determine whether the evidence presented at trial is sufficient to require that [the] instruction be given.' " *Juntenen* at ¶ 13, quoting *State v. Lessin*, 67 Ohio St.3d 487,

494 (1993). Thus, when reviewing a trial court's refusal to submit a requested instruction to the jury, an appellate court considers whether that refusal constituted " 'an abuse of discretion under the facts and circumstances of the case.' " *Id.*, quoting *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). An abuse of discretion is more than a mere error in law or judgment; it implies that the court's decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶ 29} The trial court and counsel engaged in a lengthy colloquy regarding appellant's proposed jury instructions on self-defense and the castle doctrine. The trial court denied appellant's request, concluding that the evidence presented at trial did not support the instructions. Defense counsel objected and proffered a proposed self-defense instruction. (Defendant's Ex. Proffer Jury Instructions 1.) In its charge to the jury, the trial court averred that although there had been discussion of self-defense in the testimony and opening statement, the jury was not to consider self-defense and that such defense should not play a part in its deliberations. The court further admonished the jury not to speculate as to why self-defense had been removed from their consideration. (Tr. at 658.)

{¶ 30} The discussion between the trial court and counsel regarding the proposed instructions referenced the amended version of R.C. 2901.05. On March 28, 2019, approximately six weeks prior to appellant's trial, R.C. 2901.05 was amended to provide that when evidence presented at trial tends to support a claim that a defendant used force against another in self-defense, defense of another, or in defense of his or her residence, the state must prove beyond a reasonable doubt that the defendant did not act in self-defense, defense of another, or defense or his or her residence. R.C. 2901.05(B)(1). "The amended statute shifts the burden of proof on the affirmative defense of self-defense from the defendant to the prosecution, provided 'there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence.' " *State v. Tolle*, 4th Dist. No. 19CA1095, 2020-Ohio-935, ¶ 18, quoting R.C. 2901.05(B)(1). Prior to the amendment, R.C. 2901.05 placed the burden on the defendant to demonstrate that he or she acted in self-defense. *See* former R.C. 2901.05(A) ("The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused.").

{¶ 31} R.C. 2901.05(B)(1), as amended, provides:

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

{¶ 32} In *State v. Carney*, 10th Dist. No. 19AP-402, 2020-Ohio-2691, this court very recently addressed the burden-shifting framework of R.C. 2901.05(B)(1) in the context of a sufficiency/manifest weight of the evidence claim. There, we observed that prior to the enactment of R.C. 2901.05(B)(1), a defendant claiming self-defense was required to establish, by a preponderance of the evidence, that he or she (1) was not at fault in creating the situation giving rise to the affray, (2) had a bona fide belief that he or she was in imminent danger of death or great bodily harm and his or her only means of escape from such danger was the use of such force, and (3) did not violate any duty to retreat or avoid the danger. *Carney* at ¶ 30, citing *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus, and *State v. Howard*, 10th Dist. No. 16AP-226, 2017-Ohio-8742, ¶ 22.

{¶ 33} We further observed, however, that "revisions to the law enacted shortly before the trial of this case have placed the burden on the prosecution to disprove at least one of the elements of self-defense beyond a reasonable doubt." *Id.* at ¶ 31, citing R.C. 2901.05(B)(1). Applying those revisions, we concluded that "the prosecution was required to disprove self-defense by proving beyond a reasonable doubt that [the defendant] (1) was at fault in creating the situation giving rise to the affray, OR (2) did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, OR (3) did violate a duty to retreat or avoid the danger." *Carney*, citing R.C. 2901.05(B)(1) (emphasis sic), and *Robbins* at paragraph two of the syllabus.

{¶ 34} In the present case, the trial court averred that pursuant to the "new statute," (presumably a reference to R.C. 2901.05(B)(1)), a defendant is required to "produce some evidence * * * that tends to support the finding that the defendant used deadly force in self-

defense or defense of his residence" and that "[i]f the defendant produces that evidence, the State must prove beyond a reasonable doubt the defendant did not use deadly force in self-defense or defense of the residence."  (Tr. at 585-86.)  Regarding the elements of a self-defense claim, the trial court averred that "[t]he defense has to offer evidence, if believed, that tends to establish" that he was not at fault in creating the situation giving rise to the affray, that he had reasonable grounds to believe that he was in imminent, immediate danger of death or great bodily harm and the only means of escape was the use of deadly force, and that he did not violate any duty to retreat or avoid the danger.  *Id.* at 586-88.  The court concluded that appellant had produced some evidence tending to establish only the first prong of his self-defense claim.  Citing cases decided prior to the amendment to R.C. 2901.05, the trial court averred that "the case law is if the defendant fails to produce any evidence on any one of the elements, then you're not required to instruct the jury."  *Id.* at 589.  Although this last statement arguably suggests that the trial court did not apply the burden-shifting framework of R.C. 2901.05(B)(1) in its analysis, no reversible error resulted, as the evidence presented at trial established that appellant was not entitled to a jury instruction on self-defense.

{¶ 35}  In *State v. Hubbard*, 10th Dist. No. 11AP-945, 2013-Ohio-2735, we addressed a scenario similar to that presented in the instant case.  There, the defendant testified that he retrieved his weapon from inside his house, walked onto his front porch where he saw people approaching him from his front yard, and fired his gun "to the side and down to warn them" to back up.  *Id.* at ¶ 53.  The defendant also stated that when he fired the shots, he did not intend to hurt or kill anyone.  *Id.*  Upon this evidence, the trial court refused the defendant's request for self-defense and castle doctrine jury instructions.  We concluded that "[d]efendant's testimony that he did not fire his gun with the intention of harming anyone prevented defendant from claiming that he shot his gun in an attempt to repel force with force."  *Id.* at ¶ 54.  We reasoned:

> " 'By its terms, self-defense presumes intentional, willful use of force to repel force or to escape force.' "  *State v. Johnson*, 10th Dist. No. 06AP-878, 2007-Ohio-2792, ¶ 41, * * * quoting *State v. Williams*, 1st Dist. No, C810450 (July 28, 1982). * * * A defendant claiming self-defense "concedes he had the purpose to commit the act, but asserts that he was justified in his actions." *State v. Barnd*, 85 Ohio App.3d 254, 260, 619 N.E.2d 518 (3d Dist.1993).  Thus, when an individual testifies

that they did not intend to cause harm, such testimony prevents the individual from claiming self-defense. * * * *State v. Herrington*, 9th Dist. No 25150, 2010-Ohio-6426, ¶ 13 (because the defendant testified that "he did not have the intent to shoot or kill during the incident," such testimony "was inconsistent with a claim of self-defense").

*Id.*

{¶ 36} In the instant case, appellant testified on direct examination that he fired the first shot "towards the ground" in order to "get [Bonet] away so I could run back inside my house and call the police." (Tr. at 545.) He further averred that after Bonet started running away, he fired three more shots to "get [Bonet] at least to the other side of Deshler, far enough for me to run back up through the middle of the houses and back inside the house through the back." *Id.* at 547. On cross-examination, he admitted that he intentionally fired his weapon four times in Bonet's direction; however, he denied that he was trying to shoot him. Rather, he "was trying to shoot near him to scare him off with the gunshots." *Id.* at 561. He also stated that he "was trying to shoot at the ground by him but not directly at him." *Id.* at 563. As in *Hubbard*, appellant's testimony that he did not fire his gun with the intention of harming Bonet prevented him from claiming that he fired his gun in self-defense.

{¶ 37} Appellant also contends the jury should have been given the additional instructions on self-defense as set forth in R.C. 2901.05(B)(2) and 2901.09(B). We disagree.

{¶ 38} R.C. 2901.05(B)(2) creates a rebuttable presumption that an accused acted in self-defense when using defensive force that is intended or likely to cause death or great bodily harm against a person who is in the process of unlawfully entering the accused's residence." As relevant here, "residence" includes "an attached porch." R.C. 2901.05(D)(2) and (3). "Thus, in Ohio, 'a person is presumed to have acted in self-defense,' and may use deadly force, 'when attempting to expel or expelling another from their home who is unlawfully present.' " *Hubbard* at ¶ 52, quoting *State v. Johnson,* 8th Dist. No. 92310, 2010-Ohio-145, ¶ 18.

{¶ 39} R.C. 2901.09(B) codifies specific circumstances under which a person has no duty to retreat and states: "For purposes of any section of the Revised Code that sets forth a criminal offense, a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence."

Thus, pursuant to R.C. 2901.09(B), there is no duty to retreat before using defensive force when a person is attacked in his or her own home. *State v. Darby*, 10th Dist. No. 10AP-416, 2011-Ohio-3816, ¶ 36, citing *State v. Williford*, 49 Ohio St.3d 247 (1990). "While under most circumstances a person may not use deadly force if he or she has available a reasonable means of retreat from the confrontation, ' "[w]here one is assaulted in his home, or the home itself is attacked, he may use such means as are necessary to repel the assailant from the house, or to prevent his forcible entry, or material injury to his home, even to the taking of life." ' " *Id.*, quoting *State v. Peacock*, 40 Ohio St. 333, 334 (1883).

{¶ 40} This court has interchangeably referred to the former version of R.C. 2901.05(B)(1)[4] and 2901.09(B)[5] as the "castle doctrine." *See Darby* at ¶ 33; *Hubbard* at ¶ 51, respectively. The "castle doctrine" derives from the tenet that one's home is one's castle and one has a right to protect it and those within it from intrusion or attack. *Id.* Appellant maintains that because he was attacked while seated on the front porch of his residence, the jury should have been instructed that he was presumed to have acted in self-defense and had no duty to retreat before using deadly force against Bonet.

{¶ 41} Initially, we note that appellant's own testimony belies his argument. As noted above, appellant testified that he did not shoot directly at Bonet and did not intend to shoot him. Rather, he only shot at the ground near Bonet or in Bonet's direction in order to drive him away from his house.

{¶ 42} Furthermore, the evidence presented in the instant case does not support an instruction under either R.C. 2901.05(B)(2) or 2901.09(B). Appellant testified that he believed Bonet had a gun in his pocket during the altercation and robbery that occurred on the front porch. He further testified that he fired one shot from his front porch after Bonet robbed him. However, the video footage contradicts this testimony. Indeed, the video footage demonstrates that appellant fired all four shots from behind Bonet as he was running down the street away from appellant. Moreover, even if appellant fired the first shot from his front porch, any threat of imminent danger abated once Bonet began running away from the house. Although appellant testified that he was not shooting at Bonet, the shots he fired struck Bonet in the back of his body. Indeed, the autopsy

---

[4] The pertinent language in former R.C. 2901.05(B)(1) and current R.C. 2901.05(B)(2) is identical.

[5] No changes to R.C. 2901.09(B) have been made since its effective date of September 9, 2008.

revealed that Bonet suffered three penetrating gunshots wounds to the back of his body. Under the circumstances, there was no justification for continuing to fire shots in Bonet's direction as he was running away from appellant's house. *See Darby* at ¶ 42 ("There was no justification presented here for continuing to shoot Ms. Mankins in the back as she attempted to run away."). *See also State v. Butler*, 10th Dist. No. 84AP-60 (July 11, 1985) ("[t]he purported claim of self-defense asserted at trial does not bear scrutiny in view of the shooting in the back of a victim moving away from the armed appellant"); *State v. Johnson*, 6th Dist. No. L-08-1325, 2009-Ohio-3500 (there are limitations to the application of self-defense; it is not available unless the defendant demonstrates that the force used to repel the danger was no more than reasonably required by the circumstances, and it is not applicable if the force used is so grossly disproportionate to the danger so as to demonstrate revenge or an evil purpose; if the accused uses a greater degree of force than is necessary under the circumstances, the conduct is not justifiable on the grounds of self-defense).

{¶ 43} For the reasons outlined above, we conclude that the evidence presented at trial was insufficient to support a jury instruction on self-defense or the castle doctrine. Accordingly, the trial court did not abuse its discretion in failing to so instruct the jury.

{¶ 44} Appellant's first and second assignments of error are overruled.

{¶ 45} In his third assignment of error, appellant contends that his trial counsel was ineffective in failing to: (1) request a jury instruction on voluntary manslaughter, (2) object to the continued use of the word "victim" by the state and its witnesses, and (3) adequately prepare him to testify. We disagree with all three assertions.

{¶ 46} "The Sixth Amendment to the United States Constitution guarantees a criminal defendant the effective assistance of counsel." *State v. Belmonte,* 10th Dist. No. 10AP-373, 2011-Ohio-1334, ¶ 8, citing *McMann v. Richardson,* 397 U.S. 759, 771 (1970). Courts employ a two-step test in determining whether the right to effective assistance of counsel has been violated. *Id.*, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The defendant must first demonstrate that counsel's performance was deficient. To so demonstrate, the defendant must show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* The defendant must then demonstrate that the deficient performance prejudiced the defense.

To do so, the defendant must prove that counsel's errors were so serious that the defendant was deprived of a fair trial, i.e., a trial whose result is reliable. *Id.*, citing *Strickland* at 687. A defendant's failure to prove either part of the test makes it unnecessary for a court to consider the other part. *State v. Richardson*, 10th Dist. No. 18AP-310, 2019-Ohio-3490, ¶ 22, citing *Strickland* at 697-98.

{¶ 47} In Ohio, a properly licensed attorney is presumed to be competent. *Belmonte* at ¶ 8. Thus, in demonstrating deficient performance, the defendant must overcome the strong presumption that counsel's performance was adequate. *Id.* at ¶ 9, citing *State v. Smith*, 17 Ohio St.3d 98, 100 (1985). In demonstrating prejudice, the defendant must prove that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.*, citing *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. "A verdict adverse to a criminal defendant is not of itself indicative that he received ineffective assistance of trial counsel." *In re J.J.A.*, 10th Dist. No. 09AP-242, 2010-Ohio-672, ¶ 14, citing *State v. Hester*, 45 Ohio St.2d 71, 75 (1976).

{¶ 48} We first address appellant's contention that his trial counsel was ineffective in failing to request a jury instruction on voluntary manslaughter. R.C. 2903.03(A) defines voluntary manslaughter and states in part: "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another."

{¶ 49} Voluntary manslaughter is "an inferior degree of murder." *State v. Rhodes*, 63 Ohio St.3d 613, 617 (1992). Although "voluntary manslaughter is not a lesser included offense of murder, the test for whether a judge should give a jury an instruction on voluntary manslaughter when a defendant is charged with murder is the same test to be applied as when an instruction on a lesser included offense is sought." *State v. Shane*, 63 Ohio St.3d 630, 632 (1992). "Thus, a defendant charged with murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter." *Id.* However, "[a]n instruction is not warranted simply because the defendant offers 'some evidence' going to the lesser included [or inferior degree]

offense." *State v. Gray,* 12th Dist. No. CA2010-03-064, 2011-Ohio-666, ¶ 23, citing *Shane* at 632-33. Instead, "[t]here must be 'sufficient evidence' to 'allow a jury to *reasonably* reject the greater offense and find the defendant on a lesser included (or inferior-degree offense.' " (Emphasis sic.) *Id.*, quoting *Shane* at 632-33.

**{¶ 50}** The test for voluntary manslaughter includes objective and subjective components. *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 153. Regarding the objective component, "a fact-finder must determine whether a serious provocation occurred and whether that provocation was 'sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *Id.*, quoting *Shane* at 635. As to the subjective component, "the fact-finder must evaluate whether 'this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage.' " *Id.*, quoting *Shane* at 634. A defendant being tried for murder must prove the mitigating circumstances of R.C. 2903.03(A) "by a preponderance of the evidence." *Thompson* at ¶ 153*,* citing *Rhodes* at 620.

**{¶ 51}** This court has observed that "[s]elf-defense on the one hand requires a showing of fear, whereas voluntary manslaughter requires rage." *State v. Thompson,* 10th Dist. No. 92AP-1124 (Feb. 23, 1993). Moreover, "[w]hen analyzing the subjective prong of the test, '[e]vidence supporting the privilege of self-defense, i.e., that the defendant feared for his own personal safety, does not constitute sudden passion or fit of rage.' " *State v. Harding*, 2d Dist. No. 24062, 2011-Ohio-2823, ¶ 43, quoting *State v. Stewart,* 10th Dist. No. 10AP-526, 2011-Ohio-466, ¶ 13.

**{¶ 52}** Here, even assuming the objective prong was satisfied, the evidence presented by appellant fails to satisfy the subjective prong. Although appellant's testimony established that Bonet robbed him, such evidence was insufficient to establish that he acted under the influence of sudden passion or fit of rage warranting an instruction on voluntary manslaughter. Appellant did not assert that he was enraged or even angered by either the altercation or the robbery. Rather, he testified that he was "nervous" and "scared" and "excited" and "feared for [his] life" during the incident. (Tr. at 544.) "[F]ear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *State v. Mack*, 82 Ohio St.3d 198, 201. Thus, in considering the subjective standard, appellant's own testimony failed to support, and

actually undermined, any claim that he acted out of sudden passion or fit of rage. *See State v. Collins*, 97 Ohio App.3d 438, 446 (8th Dist.1994). Accordingly, appellant was not entitled to an instruction on voluntary manslaughter, and trial counsel's failure to request such an instruction does not constitute ineffective assistance of counsel.

{¶ 53} Next, appellant claims that defense counsel was ineffective in failing to object to the continued use of the word "victim" by the state and its witnesses. Review of the state's questioning of law enforcement witnesses reveals multiple references to Bonet as a "victim." Appellant argues that such testimony "virtually allows opinions from police witnesses in a self defense case [and] suggests a crime rather than a non crime of self-defense and thus was opinion testimony from non experts in that specific defense." (Appellant's Brief at 30.)

{¶ 54} As the state notes in its brief, the record indicates that defense counsel raised an objection to use of the term "victim," albeit in a sidebar that was not specifically memorialized on the record. During the parties' presentation of a stipulation regarding Bonet's identity, the trial court told the jury:

> The Court: All right. Next stipulation would be sometimes we would call a witness to identify the victim. The defense and the prosecution are stipulating and agreeing that the autopsy was performed on and the photos are photos of the victim, Mr. Bonet, in this case.

(Tr. 512-13.)

{¶ 55} Thereafter, defense counsel asked to approach the bench. A discussion ensued that was not made part of the record. Immediately after going back on the record, the trial court instructed the jury as follows:

> The Court: All right. So the stipulation is as follows: The person named in the indictment is Desean Bonet, and those were the photographs. He is the deceased. I think that covers that.
>
> And, you know, there's been references through the trial about "victim." Certainly, he was shot; he's dead. But he's not necessarily a victim, you know, depending on what your findings are, so don't draw any inference because I said "victim" or other people said "victim."

You're the ones that are the final arbiters of what happened and whether a crime occurred.

Anything additional for the record on that issue?

[Defense Counsel]: No, Your Honor.  Thank you.

(Tr. 513-14.)

{¶ 56}  This exchange makes clear that defense counsel objected to the term "victim" as used by the trial court during the stipulation.  The trial court then instructed the jury that it was not to draw any inference from past use of the term "victim" by the court, the prosecutors, or the state's witnesses.  Appellant fails to explain what other steps defense counsel could have taken regarding this issue.  Indeed, defense counsel's objection resulted in the trial court's issuance of a curative instruction.  "As an appellate court, we must presume that the jury followed the trial court's instructions."  *State v. Brown,* 10th Dist. No. 15AP-935, 2016-Ohio-7944, ¶ 18, citing *State v. Walburg,* 10th Dist. No. 10AP-1087, 2011-Ohio-4762, ¶ 53.

{¶ 57} Lastly, appellant argues that defense counsel's questioning of him "was woefully insufficient and might have contributed to the failure of the Court to provide a self-defense instruction." (Appellant's Brief at 30.)  Appellant maintains that "[t]he Defendant-Appellant seem[ed] unprepared to discuss his feeling at the time of the assault and robbery and defensive shooting."  *Id.*

{¶ 58} While appellant claims that counsel's questioning was inadequate and may have contributed to the trial court's decision not to give the requested self-defense jury instruction, he fails to suggest what questions, if any, counsel should have asked that would have compelled the court to provide such an instruction.  Additionally, " 'an appellate court reviewing an ineffective assistance claim will not second guess counsel's strategy in direct and cross-examination.' "  *State v. Lefthandfull*, 10th Dist. No. 00AP-584 (Mar. 6, 2001), quoting *State v. Gray*, 10th Dist. No. 99AP-666 (Mar. 28, 2000).

{¶ 59} Further, appellant's contention that he was "unprepared to discuss his feeling" is belied by his own testimony.  Appellant candidly and without hesitation discussed "his feeling" about the altercation and robbery when he testified that he was "scared," "afraid," "nervous," and "in fear of [his] life" during the incident.  (Tr. at 544.)  Further, the record is devoid of evidence about discussions between appellant and trial

counsel regarding trial preparation. Because a claim of ineffective assistance of counsel arising from counsel's alleged failure to adequately prepare him to testify relies on evidence outside the record, such a claim is not appropriate on direct appeal. *See State v. Davis*, 10th Dist. No 05AP-193, 2006-Ohio-5039, ¶ 19 ("When allegations of ineffective assistance of counsel hinge on facts not appearing in the record, the proper remedy is a petition for post-conviction relief rather than direct appeal.").

**{¶ 60}** For all the foregoing reasons, appellant has failed to demonstrate that he was provided ineffective assistance of counsel at trial.

**{¶ 61}** Appellant's third assignment of error is overruled.

**{¶ 62}** Having overruled appellant's first, second, and third assignments of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

SADLER, P.J., and BROWN, J., concur.