[Cite as *State v. Daley*, 2020-Ohio-4390.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

     Plaintiff-Appellee,                    :

                                    No. 19AP-561

v.                                                    :        (C.P.C. No. 17CR-6530)

Shane M. Daley,                                :        (REGULAR CALENDAR)

     Defendant-Appellant.                 :

---

D E C I S I O N

Rendered on September 10, 2020

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Barbara A. Farnbacher*, for appellee. **Argued:** *Barbara A. Farnbacher*.

**On brief:** *Todd W. Barstow*, for appellant. **Argued:** *Todd W. Barstow*.

---

APPEAL from the Franklin County Court of Common Pleas

SADLER, P.J.

{¶ 1} Defendant-appellant, Shane M. Daley, appeals from a judgment of the Franklin County Court of Common Pleas convicting appellant of murder, kidnapping, and having a weapon while under disability. For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} This case arises out of a November 21, 2017 incident during which appellant shot and killed the victim, Christopher Pfaff ("C.P."), at C.P.'s apartment on Legacy Lane in Columbus, Ohio. Appellant's co-defendant, Mackenzie Litteral, was also shot during the incident but recovered.

{¶ 3} At the time of the murder, Cheyenne Newland was Litteral's girlfriend. Though Newland did not witness C.P.'s murder, she testified about the events leading up to

C.P.'s murder.  On November 18, 2017, Litteral was released from prison after serving four months on a parole violation stemming from a prior drug conviction.  On that date, Newland was living at a residence in London, Ohio she shared with appellant, who called himself "Fredo," and appellant's girlfriend, Shyanne Cunningham.  (Tr. Vol. 1 at 101.)  After taking Litteral to his parents' home for a visit, Newland moved Litteral into the London residence where he first met appellant.

{¶ 4}  On the day prior to the murder, Newland drove appellant and Litteral to a Waffle House restaurant to buy marijuana from C.P., who was one of Newland's suppliers.  Newland stated that she met C.P. a few months before the murder and that she had "partied" with C.P. and some of his friends at her London residence on occasion.  (Tr. Vol. 1 at 105.)  According to Newland, appellant was sitting in the passenger seat of a vehicle parked at Waffle House when appellant got in the back seat.  Appellant and C.P. had not previously met.  When appellant left C.P.'s vehicle after the drug purchase was completed, he accidently left his cellular phone behind.

{¶ 5}  When appellant later realized he had left his phone in C.P.'s vehicle, he asked Newland to call C.P. to "let him know to put my phone up."  (Tr. Vol. 1 at 111.)  According to Newland, she contacted C.P.'s girlfriend, Makayla Emrick, who told her she found the phone and C.P. would put it in his safe.  In her trial testimony, however, Emrick stated she mistakenly left the phone at the home of C.P.'s drug supplier.

{¶ 6}  On November 21, 2017, the date of the murder, Newland drove to C.P.'s apartment to buy some more marijuana and to pick up appellant's phone.  According to Newland, C.P. told her that his safe had been stolen and he no longer had appellant's phone.  Newland testified when she told appellant C.P. no longer had his phone, appellant became "angry."  (Tr. Vol. 1 at 115.)  Appellant told Newland he would buy gas for her vehicle if she agreed to take him to C.P.'s apartment.  According to Newland, appellant called C.P. on her phone before they left for C.P.'s apartment, and she overheard C.P. on the phone telling appellant "I don't care about your cheap phone.  Why would I have it?"  (Tr. Vol. 1 at 126-27.)

{¶ 7}  Appellant and Litteral climbed into Newland's rented Jeep Patriot, and the three of them headed for C.P.'s apartment which was approximately 30 minutes away.  Newland knew appellant owned a handgun and a shotgun because she had seen both

weapons in the bedroom appellant shared with Cunningham.  Newland testified about a conversation she had with appellant before they left for C.P.'s apartment:

> Q.  Okay.  So the trip there to get the phone back, you're saying nobody mentioned a gun?
>
> A.  Correct.  I mentioned don't bring a gun, because I also knew that [C.P] had guns and I just didn't want to cause trouble.
>
> Q.  Why would you say that, don't bring a gun?
>
> A.  Because I knew [C.P.] had guns; and if anything did go crazy south, I didn't want anybody to end up how this ended up.
>
> Q.  Okay.  Were you worried that somebody in your car was bringing a gun?
>
> A.  I was worried that they had a temper and they would have, yes.
>
> Q.  And by "they," you mean [appellant] and [Litteral]?
>
> A.  [Appellant].
>
> Q.  Okay.  You were worried that [appellant] would have a temper and bring a gun?
>
> A.  Yeah.
>
> Q.  So you said don't bring one?
>
> A.  Right.
>
> Q.  What did he say to that?
>
> A.  He said he wouldn't.

 (Tr. Vol. 1 at 120-21.)

{¶ 8}    When they arrived in C.P.'s neighborhood, Newland parked her Jeep at a bar called Lucky's.  Newland explained that C.P.'s building had a security gate and that she did not have the keycode.  She did state, however, that on a previous occasion, she drove to C.P.'s apartment, C.P. had been expecting her, and gave her the code for the gate over the phone.  On this occasion, Newland did not believe anyone at C.P.'s apartment knew they were coming.  Though Newland did not want Litteral to go to C.P.'s apartment with appellant, when appellant asked Litteral to go, Litteral agreed.  Newland remained in the vehicle.

{¶ 9} There were six eyewitnesses to the murder, including appellant and Litteral. On the date of the murder, C.P. was living in the apartment with his girlfriend, Emrick, and his friend, Abdelkarim Khatab, who was also known as "Abood." (Tr. Vol. 1 at 236.) According to Emrick, both C.P. and Abood worked in construction and sold drugs. Emrick was also aware that C.P. owned a Glock 9mm handgun.

{¶ 10} On November 21, 2017, several of C.P.'s friends arrived at the apartment for a small party. Emrick testified C.P.'s friend, Greg Watson, who was known as "G," arrived at 5:30 p.m., and Mark Sullivan and Chassidy Vance showed up around 6:00 p.m. followed by Calvin Spencer. (Tr. Vol. 2 at 362.) While his guests played video games and smoked marijuana, C.P. and Spencer went out to buy liquor. Another guest by the name of Riley Keller also arrived at the apartment.

{¶ 11} Emrick testified later in the evening there was a knock at the front door. When Emrick cracked the door open to ask who was there, a man she did not recognize answered "Fredo." (Tr. Vol. 1 at 268.) When Emrick asked Fredo what he wanted, he told her he was there for his phone. Emrick testified she asked Fredo and his friend to wait in the car while she went to get C.P., but Fredo said he would not wait in the car because he had driven 45 minutes to get there. According to Emrick, she then asked the two men to show her their hands, which they did. Emrick closed and locked the front door before going to get C.P., who was in the bathroom.

{¶ 12} When Emrick went to the bathroom door to tell C.P. that Fredo was there and to ask what she should do, C.P. told her "[h]old on. I'll be there. I'll answer it." (Tr. Vol. 1 at 270.) C.P. came out of the bathroom, walked to the front door, quickly pulled the door opened and asked "[h]ey, man, what's up?" (Tr. Vol.1 at 270.) Emrick then saw Fredo grab C.P. by the shirt as he entered the apartment and exclaim "[w]here's my stuff?" and "[w]here's my shit?" (Tr. Vol. 1 at 271, 272.) At that point, Emrick saw Litteral step around Fredo and begin striking C.P. with his fists. According to Emrick, when she and Keller rose from their seated positions and moved toward the scuffle, Fredo turned toward them, pointed a handgun in their faces, and yelled "[s]it down. Shut the fuck up. I'll shoot. I'll shoot." (Tr. Vol. 1 at 272.) Emrick told the jury what happened next:

> Q. Okay. So you say Fredo's pulled the gun and telling everybody to sit down.
>
> Tell me -- keep going. What happens next?

> A. After that, after he's pointing -- gets done pointing the gun at everyone else and everyone starts running, you know, panicking, he turns the gun towards [C.P.] and where -- like towards where Abood was.
>
> And by this time, like [C.P.] and [Litteral] was in between like the wall of the washer and the dryer and the microwave. So in that corner.
>
> Q. Uh-huh.
>
> A. And that's when he started shooting.
>
> Q. Who?
>
> A. Fredo.
>
> Q. Okay.
>
> A. I jumped down to the ground. Everyone else pretty much like dove, did whatever they did. After that, after all of his gunshots go off, I hear another round of gunshots.
>
> After all that goes off, like I pat myself. I'm like, "Okay. No one got shot. No one got shot. Is everyone okay? Is everyone okay?"
>
> I look up and see [C.P.] like looking at the wall and like looking at the posters that we had hung up, stumbling back, and then he fell to his knees and then his stomach and then started gasping for air.

(Tr. Vol. 1 at 274-75.)

{¶ 13} On cross-examination, Emrick admitted before anyone called 911, she called her drug dealer who told her to hide the evidence. According to Emrick, she told Keller to hide C.P.'s gun, and he placed it under a dresser in a bedroom closet, where it was later recovered by police. Columbus police arrived within minutes of the shooting and separated all the witnesses before obtaining their statements and collecting evidence.

{¶ 14} Spencer's testimony was similar to Emrick's. Spencer knew C.P. because he had purchased marijuana from him on a number of occasions, and he testified C.P. had invited him over on the night of the murder. According to Spencer, when C.P. exited the bathroom and answered the door that evening, he invited appellant and Litteral to come in. Spencer recalled appellant was wearing a gray or brown hoodie and Litteral was wearing a red hoodie. Spencer acknowledged that he had never met appellant or Litteral prior to the murder but that he had learned their names after the incident. Spencer testified when appellant entered the apartment, he grabbed C.P. by the shirt, pointed a revolver at C.P.'s

chest, and asked "[w]here's my shit?" (Tr. Vol. 2 at 440.) According to Spencer, Litteral then began punching C.P., and when he stood up to help C.P., appellant pointed a revolver at him and yelled "[s]it the fuck back down." (Tr. Vol. 2 at 441.)

{¶ 15} Spencer testified when appellant turned back towards C.P., he heard gunshots, but he did not see who was doing the shooting. According to Spencer, four or five gunshots rang out before appellant and Litteral ran out of the apartment. Spencer then saw C.P. sink to his knees and fall.

{¶ 16} Abood testified C.P. was "like a brother" to him. (Tr. Vol. 3 at 593.) According to Abood, when Emrick went to answer the door on the night of the murder, he heard the man outside mention his phone. Abood recalled that when C.P. opened the door, Litteral rushed in and began hitting him. Abood recalled that when everyone stood up to help C.P., appellant turned and pointed his gun at them.[1] Abood then saw C.P. pull out his handgun and fire a shot and then he saw appellant turn and fire a shot at C.P. Abood testified he heard a total of six shots before appellant and Litteral fled the apartment, but he did not realize anyone had been shot until appellant and Litteral fled. Abood acknowledged on cross-examination that he spoke with Keller some time after the incident and learned that their "[s]tories didn't match." (Tr. Vol. 3 at 625.) Abood responded in the affirmative when appellant's counsel asked him if he and Keller tried to make their stories match.

{¶ 17} Watson testified he knew C.P. from school, but he had never been to the Legacy Lane apartment prior to the night of the murder. According to Watson, he and some of the other guests were playing a video game and smoking marijuana when there was a knock at the door. Watson testified he heard the person at the door tell Emrick he was there to get his phone from C.P. When Emrick closed and locked the front door before going to get C.P., Watson "knew something was suspicious" so he grabbed an empty liquor bottle and stood by the door. (Tr. Vol. 3 at 524.) Watson remembered that as soon as C.P. opened the door, appellant, who Watson referred to as a light-skinned black man, began punching C.P., and when C.P. began fighting back, the other man, who Watson referred to as the white guy, jumped into the fight. According to Watson, when he made a move to help C.P., appellant pointed a gun at him. Watson then saw appellant point his gun at C.P.'s chest

---

[1] Abood had never met appellant or Litteral prior to the murder, and he described them during his testimony as the "light-skinned male black" and "the white guy" respectively. (Tr. at Vol. 3 608.)

and pull the trigger.  Watson also claimed that Litteral had a chrome plated pistol and that he fired it one time, but he later stated that he did not actually see Litteral fire a weapon. He did recall seeing C.P. fire his handgun one time.  Though Watson testified he saw three gunshots fired, he heard six or seven in total.  On cross-examination, Watson admitted that he never told investigators that Litteral had a weapon that night or that he had grabbed a bottle and stood by the door before appellant and Litteral entered the apartment.

{¶ 18}  Keller knew appellant because he had been to Newland's home in London, Ohio with C.P.  About ten minutes after Keller arrived at C.P.'s apartment on the night of the murder, he heard a knock at the door.  When Emrick went to the door, Keller saw a man in a red hoodie, who he later recalled as Fredo, asking about his telephone.  He heard Emrick tell the two men to wait in their car, but they refused stating "[w]e just drove 45 minutes here to get our phone."  (Tr. Vol. 2 at 376.)  Emrick then asked the two men to show her their hands before she shut and locked the door.

{¶ 19}  According to Keller, when C.P. opened the door and told the two men to come in, they asked C.P. to go outside.  When C.P. refused, appellant hit C.P. and grabbed his shirt.  Keller testified he saw Litteral waiving a gun around and then heard shots fired before he dove behind the couch.  When Keller looked up again, he saw appellant with a revolver pointed at C.P.  Keller stated C.P. had already been shot at that point, and he saw Litteral and appellant run out of the apartment.  Keller admitted hiding C.P.'s gun under a dresser in Abood's room, and he and Emrick hid other items including drug paraphernalia.  He also admitted that he initially told police that C.P. did not have a gun that evening.

{¶ 20}  Vance essentially corroborated the testimony of the other eyewitnesses when she testified appellant grabbed C.P. and began fighting with him as soon as he entered the apartment.  Neither she nor her boyfriend, Sullivan, saw the shooting because they ran to the bedroom and tried to escape as soon as the fighting started.[2]

{¶ 21}  Newland testified about the events that she witnessed immediately after the murder.  Newland stated that when appellant returned to her vehicle that night, he was "out of breath, looks like he's been in a tussle, like just freaking out, like, 'We got to go get [Litteral].' "  (Tr. Vol. 1 at 130.)  Newland exited her vehicle and saw Litteral walking towards her holding his stomach, and she heard appellant exclaim "[Litteral] got shot."  (Tr. Vol. 1

---

[2] Sullivan was the only eyewitness to the shooting who did not testify at trial.

at 133.)  When Litteral climbed into the back seat of her vehicle, he told Newland to call 911. According to Newland, when she attempted to make the call, appellant began screaming at her not to call 911, and he tried to take the phone away.  An audio recording of Newland's 911 call was admitted into evidence as State's Exhibit M and played for the jury.  Newland testified she can be heard on the recording telling appellant to "[s]hut the fuck up," and she explained that appellant "keeps telling me to hang up the phone and that we're going to get rid of the gun and we're going to take [Litteral] to the hospital and he don't want to go to jail.  And I'm just like, 'I don't care.  My boyfriend got shot.' "  (Tr. Vol. 1 at 139.)  Newland testified she can also be heard telling appellant to "[g]et the fuck out of my car."  (Tr. Vol. 1 at 139.)  When appellant got out of the car, Newland drove to a nearby gas station to await medical personnel.  Litteral was subsequently taken to the hospital by ambulance, and Newland was taken to police headquarters to be interviewed.

{¶ 22}  Litteral testified in his own defense that on the date of the murder, he believed Newland was just taking appellant to C.P.'s apartment to pick up his phone.  According to Litteral, when they arrived at Lucky's, appellant asked him to accompany him up to C.P.'s apartment because Litteral knew the way.  Litteral testified when appellant knocked on C.P.'s door, a girl answered, and appellant spoke with her before she closed the door. Litteral recalled C.P. then came to the door and invited them in.  Once inside, Litteral observed C.P. and appellant engage in a conversation about appellant's phone that "all of a sudden for no reason it just seems like it's getting kind of heated."  (Tr. Vol. 4 at 816.)  At that point, Litteral saw both C.P. and appellant "show guns."  (Tr. Vol. 4 at 817-18.)  Litteral then attempted to get between appellant and C.P. by pushing C.P. back.  According to Litteral, C.P. fired a shot that struck him in the abdomen.  As Litteral ran from the apartment, he heard more gunshots ring out.

{¶ 23}  Litteral denied throwing any punches at C.P. during the incident, and he remembered one person got off the couch and said something to appellant.  Litteral testified he lost consciousness after he reached Newland's vehicle but that he remembered being placed in an ambulance.

{¶ 24}  Prior to trial, the parties submitted stipulations of fact, which were read to the jury.  The parties stipulated that the Franklin County Coroner would testify C.P. died from a single gunshot wound that "traveled generally right to left and back to front and

fractured the posteriolateral right seventh rib; perforated the lower lobe of the right lung, the upper lobe of the right lung at the hilum, the pericardium, the right atrial appendage, the aorta, the pulmonic valve, the anterior septum of the heart, the upper lobe of the left lung, the left third intercostal space, and the skin and subcutaneous soft issues of the left tissue." (Tr. Vol. 4 at 686; State's Ex. C-1.) The parties further stipulated that a forensic examination of the bullets, cartridges, and bullet fragments recovered at the scene revealed that the two spent cartridge cases were fired by the 9mm Glock and that the spent .38 caliber bullet was not fired by the 9mm Glock. The bullet and jacket fragments found at the scene "were all unsuitable for identification." (Tr. Vol. 4 at 689; State's Ex. D-1.) A DNA analysis was performed on the magazine of the 9mm Glock and the parties stipulated that C.P. "can be assumed to be a contribut0r of the DNA." (Tr. Vol. 4 at 690; State's Ex. E-1.)[3] The parties also stipulated that in 2012, appellant "was adjudicated a delinquent child of burglary, in violation of Ohio Revised Code 2911.12." (Tr. Vol. 4 at 691.)

{¶ 25} At the close of the case-in-chief of plaintiff-appellee, State of Ohio, the trial court granted appellant's Crim.R. 41 motion for acquittal as to the count in the indictment charging appellant with aggravated burglary. The jury subsequently returned a guilty verdict as to the count in the indictment charging appellant with murder during the commission of a felony but found appellant not guilty of the counts in the indictment charging appellant with murder by purposeful killing and aggravated robbery. The jury found appellant guilty of the counts in the indictment charging appellant with kidnapping and the count in the indictment charging appellant with having a weapon while under disability. Appellant was found guilty of the firearm specification attached to each of the counts in the indictment for which they found appellant guilty, with the exception of the firearm specification pertaining to the kidnapping of Vance.

{¶ 26} As a result of a sentencing hearing, the trial court sentenced appellant to an aggregate prison term of 24 years to life. Appellant timely appealed to this court from the judgment of the trial court.

## II. ASSIGNMENT OF ERROR

{¶ 27} Appellant assigns the following as trial court error:

---

[3] Newland was the contributor of DNA found on a sweatshirt recovered from her vehicle and Litteral was the contributor of DNA found on a knit cap recovered from Newland's vehicle.

THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF FAILURE TO PROVIDE NOTICE OF CHANGE OF ADDRESS AND FAILURE TO REGISTER AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## III.  STANDARD OF REVIEW

{¶ 28}  "Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict." *State v. Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 15, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  Whether the evidence is legally sufficient to support a verdict is a question of law, not fact.  *Kurtz* at ¶ 15. In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "  *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact."  *State v. Patterson*, 10th Dist. No. 15AP-1117, 2016-Ohio-7130, ¶ 32, citing *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 29}  "In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction."  *Kurtz* at ¶ 16, citing *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80.  "Further, 'the testimony of one witness, if believed by the jury, is enough to support a conviction.' "  *Patterson* at ¶ 33, quoting *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42.  *See also State v. Clark*, 10th Dist. No. 15AP-926, 2016-Ohio-5493, ¶ 25.

{¶ 30}  "Even though supported by sufficient evidence, a conviction may still be reversed as being against the manifest weight of the evidence."  *State v. McCombs*, 10th Dist. No. 15AP-245, 2015-Ohio-3848, ¶ 3, citing *Thompkins* at 387.  "While sufficiency of

the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 38.

{¶ 31} "When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Patterson* at ¶ 34, citing *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most ' "exceptional case in which the evidence weighs heavily against the conviction." ' " *State v. Jenkins*, 10th Dist. No. 18AP-324, 2018-Ohio-4988, ¶ 21, quoting *Thompkins* at 387, quoting *Martin* at 175.

{¶ 32} "In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses." *Jenkins* at ¶ 22, citing *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting such review, " 'we are guided by the presumption that the jury, * * * "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." ' " *Jenkins* at ¶ 22, quoting *Cattledge* at ¶ 6, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Accordingly, we afford great deference to the jury's determination of witness credibility." *State v. Albert*, 10th Dist. No 14AP-30, 2015-Ohio-249, ¶ 14. "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, *discretionary appeal not allowed*, 140 Ohio St.3d 1455, 2014-Ohio-4414, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

## IV. LEGAL ANALYSIS

### A. Assignment of Error

{¶ 33} Though appellant's assignment of error asserts a sufficiency and manifest weight challenge to his convictions, the assignment of error does not match the particular facts of this case as there was no charge in the indictment related to notice and registration. Nevertheless, because appellee disregarded the apparent mistake in the assignment of error and focused on appellant's contention that his convictions for murder and kidnapping were not supported by sufficient evidence and were against the manifest weight of the evidence, we will analyze the appeal under the sufficiency and manifest-weight standards. We do note, however, that appellant has not argued that his convictions of having a weapon while under disability is either unsupported by sufficient evidence or against the manifest weight of the evidence. Accordingly, we shall confine our review to the convictions of murder and kidnapping.

{¶ 34} The offense of murder is defined in R.C. 2903.02, in relevant part, as follows:

> (B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.
>
> * * *
>
> (D) Whoever violates this section is guilty of murder, and shall be punished as provided in section 2929.02 of the Revised Code.

{¶ 35} R.C. 2905.01 defines the offense of kidnapping, in relevant part, as follows:

> (A) No person, by * * * threat * * * shall * * * restrain the liberty of the other person, for any of the following purposes:
>
> * * *
>
> (2) To facilitate the commission of any felony or flight thereafter;
>
> * * *
>
> (C)(1) Whoever violates this section is guilty of kidnapping. Except as otherwise provided in this division or division (C)(2) or (3) of this section, kidnapping is a felony of the first degree.

{¶ 36} R.C. 2903.02(B), "[t]he felony-murder statute[,] imposes what is in essence strict liability. Though intent to commit the predicate felony is required, intent to kill is not." *State v. Nolan*, 141 Ohio St.3d 454, 2014-Ohio-4800, ¶ 9, citing *State v. Miller*, 96 Ohio St.3d 384, 2002-Ohio-4931, ¶ 31-33; *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, ¶ 43.

{¶ 37} In his merit brief, appellant essentially concedes the evidence produced by appellee, if believed, was sufficient to support a guilty verdict on all the charges for which he was convicted, including murder and kidnapping. Appellant's argument in support of his assignment of error is that eyewitnesses produced by the prosecution "were a collection of liars and obstructers of the truth." (Appellant's Brief at 2.) As such, appellant's argument challenges the jury verdict as being against the manifest weight of the evidence but does not present a challenge to the jury verdict on sufficiency grounds. *State v. Cervantes*, 10th Dist. No. 18AP-505, 2019-Ohio-1373, ¶ 33. *See also Yarbrough*, 2002-Ohio-2126, at ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). Accordingly, we shall review the conviction under the manifest-weight standard. *Cervantes* at ¶ 33; *Yarbrough* at ¶ 79-80; *Bankston* at ¶ 4.

{¶ 38} At trial, appellant claimed he shot and killed C.P. in self-defense. R.C. 2901.05 was amended just prior to appellant's trial, and the statute sets forth the law of self-defense, in relevant part, as follows:

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-

defense, defense of another, or defense of that person's residence, as the case may be.[4]

R.C. 2901.05(B)(1).

{¶ 39} The recent "revisions to the law * * * placed the burden on the prosecution to disprove at least one of the elements of self-defense beyond a reasonable doubt." *State v. Carney*, 10th Dist. No. 19AP-402, 2020-Ohio-2691, ¶ 31, citing R.C. 2901.05(B)(1). *See also State v. Collins*, 10th Dist. No. 19AP-373, 2020-Ohio-3126, ¶ 30. Accordingly, under the self-defense statute as recently amended, "the prosecution [is] required to disprove self-defense by proving beyond a reasonable doubt that [the defendant] (1) was at fault in creating the situation giving rise to the affray, OR (2) did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, OR (3) did violate a duty to retreat or avoid the danger." (Emphasis sic.) *Carney* at ¶ 31, citing R.C. 2901.05(B)(1); *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus.

{¶ 40} According to appellant, the testimony in the record shows the following events transpired immediately preceding the victim's death:

> [Appellant] went to retrieve his property, a cell phone. He did not force his way into [C.P.'s] apartment; he was not deceptive as to his purpose; he did not sneak into the apartment in the middle of the night or when no one was home. Once inside, he was confronted with a combative [C.P.] and his friends. Litteral attempted to mediate, but was physically confronted by the armed [C.P.], who styled himself "Savage"; "Fuck the World"; and "Ain't No Bitch in My Blood" on social media. * * * [Appellant] was then threatened by [C.P.'s] friends and fellow partygoers, one of whom was armed with a deadly weapon. Only at that point did he show his pistol, the brandishing of which kept them at bay. He then heard [C.P.] shoot Litteral, and then turned to see [C.P.] pointing his pistol at him. He then fired one shot, and prudently fled the scene.

 (Appellant's Brief at 4.)

{¶ 41} On direct examination, appellant told the jury that several months before the murder, he acquired a .38 caliber revolver and a shotgun because he had been robbed. He

---

[4] The parties and the trial court agreed the amended statute, effective March 28, 2019, applied to the case, and the trial court instructed the jury in accordance with the new statute. Neither party has alleged trial court error with regard to the instruction.

did admit that Newland and Litteral were unaware he brought the revolver with him to C.P.'s apartment. Appellant also acknowledged during his direct examination that he knew he was prohibited from owning any firearms due to his prior conviction.

{¶ 42} Appellant claimed that even though he got angry when Newland told him C.P. no longer had his phone, C.P. later told him over the telephone that he still had the phone and that appellant could come over to pick it up. Appellant testified after the shooting, he threw the gun over a bridge and into some bushes. On cross-examination, appellant conceded that he made an effort to change his appearance after the murder and that he told his girlfriend's sister that she could not have guests at her mother's house while he was staying there because they might recognize him from news reports. Appellant also admitted that he never told Newland that he had shot C.P. in self-defense.

{¶ 43} We acknowledge that there is testimony in the record, primarily that of appellant, that arguably supports appellant's version of events. However, in conducting a manifest-weight analysis, this court "may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Patterson*, 2016-Ohio-7130, at ¶ 34, citing *Thompkins*, 78 Ohio St.3d at 387, citing *Martin*, 20 Ohio App.3d at 175. We find the eyewitnesses' accounts of the murder provided the jury with overwhelming evidence to both satisfy the elements of the offenses for which the jury found appellant guilty and disprove appellant's self-defense claim.

{¶ 44} As detailed above, Emrick, Spencer, Keller, Watson, and Vance each testified appellant grabbed C.P. by the shirt as soon as he entered the apartment. Keller, Watson, and Emrick also recalled appellant began hitting C.P. on entering the apartment. Emrick, Spencer, Keller, Watson, and Abood each testified appellant pointed a gun at them when they made a move toward the affray and then he turned and fired a shot at C.P. Based on the eyewitnesses' accounts of the murder, we find that appellee produced overwhelming evidence to support a finding that appellant was the aggressor. Thus, the weight of the evidence established appellant was at fault for creating the situation giving rise to the affray.

{¶ 45} Appellant argues, however, that the admissions of Keller and Emrick that they made an effort to hide incriminating evidence after the shooting required the jury to disbelieve their testimony regarding the events that led to C.P.'s death. Similarly, appellant claims the jury was required to disbelieve Watson's testimony because he admitted initially lying to police about his conduct in grabbing an empty liquor bottle and standing by the door as appellant and Litteral waited outside. Appellant also claims Abood's testimony about the events that transpired on November 21, 2017 lacked credibility because Abood attempted to minimize C.P.'s involvement in drug dealing during his direct examination.

{¶ 46} Though these were relevant factors for the jury to consider in assessing the credibility of the eyewitnesses' testimony, the record shows counsel for appellant and his co-defendant brought these credibility issues to the attention of the jury during cross-examination and/or closing arguments. It was the responsibility of the jury to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *Cattledge*, 2010-Ohio-4953, at ¶ 6. In conducting our manifest-weight analysis, "we afford great deference to the jury's determination of witness credibility." *Albert*, 2015-Ohio-249, at ¶ 14.

{¶ 47} Moreover, there is substantial evidence in the record refuting appellant's version of events. For example, undisputed evidence shows that when appellant left the crime scene, he tried to prevent Newland from calling 911, even though Litteral had been shot. Appellant then disposed of the murder weapon and did not return to his home. Appellant proceeded to stay at a residence owned by his girlfriend's mother until his arrest. The evidence also shows during that five-day period, appellant stayed at this residence, and he made an effort to change his physical appearance by cutting his dreadlocks. The jury was permitted to consider this evidence as proof of appellant's consciousness of guilt as appellant's conduct belies any claim that he shot the victim and held several others at gunpoint in self-defense.

{¶ 48} Additionally, the testimony of appellant's co-defendant contradicts that of appellant's testimony. As earlier noted, Litteral testified once he and appellant were inside C.P.'s apartment, appellant and C.P. engaged in a heated argument which escalated to physical violence and guns being drawn. Even if Litteral's testimony were viewed in appellant's favor, his testimony merely shows appellant and the victim may have engaged

in mutual combat, which does not support any claim of self-defense as one claiming self-defense must not be at fault for creating the situation giving rise to the affray. *State v. Milling*, 9th Dist. No. 24402, 2009-Ohio-3002, ¶ 17, quoting *Black's Law Dictionary* 1045 (8th Ed.2004) (defining mutual combat as " '[a] consensual fight on equal terms — arising from a moment of passion but not in self-defense — between two persons armed with deadly weapons' "). Because the jury acquitted Litteral of all charges, it is evident the jury believed Litteral's testimony and disbelieved appellant's testimony. In conducting our manifest-weight analysis, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony,' " and "we afford great deference to the jury's determination of witness credibility." *Cattledge* at ¶ 6, quoting *Seasons Coal Co.*, 10 Ohio St.3d at 80; *Albert* at ¶ 14. Even though this court may consider the credibility of the witnesses in conducting our manifest-weight analysis, on this record, we do not perceive any justifiable reason to second guess the credibility determinations made by the jury.

{¶ 49} On independent review of the entire record in this case, we cannot say the jury lost its way and created a manifest miscarriage of justice in finding appellant guilty of murder, kidnapping, and the associated firearm specifications. Accordingly, we overrule appellant's assignment of error.

## V. CONCLUSION

{¶ 50} Having overruled appellant's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER and BEATTY BLUNT, JJ., concur.

_____