[Cite as *State v. Goings*, 2025-Ohio-485.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2024-CA-9 |
| | : | |
| v. | : | Trial Court Case No. 23 CRB 01571 |
| | : | |
| DASHAWN M. GOINGS | : | (Criminal Appeal from Municipal Court) |
| | : | |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on February 14, 2025

. . . . . . . . . . .

NICOLE K. DIETZ, Attorney for Appellant

DANIELLE E. SOLLARS, Attorney for Appellee

. . . . . . . . . . . .

EPLEY, P.J.

{¶ 1} DaShawn M. Goings appeals from his convictions in the Xenia Municipal Court on two counts of aggravated menacing and one count each of menacing by stalking and telecommunications harassment. He claims that the trial court erred by admitting text messages as evidence during the bench trial and by overruling his Crim.R. 29(A)

motion for acquittal.    For the following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 2} According to the State's evidence at trial, the complainant, Alisha Willard, met Goings approximately a week before Thanksgiving 2023 when she was trying to take a drunk mutual friend home from a bar in Wilmington.   Willard and Goings did not become romantically involved, but Willard stated that she cared about him.

{¶ 3} A short time later, Goings became angry with Willard when she refused to pick up 1,000 pressed pills for him.   He later became more upset when she called the police, asking them to perform a welfare check on him; Willard had believed that he was overdosing and could not reach him to provide Narcan.   Willard testified that Goings ended up being arrested on an outstanding warrant that she did not know about.

{¶ 4} Their relationship further deteriorated on November 22, 2023.   According to Willard, Goings accused her of stealing marijuana from him, which escalated into Goings's searching and stealing some of Willard's belongings and reportedly assaulting her on and off for a couple of hours.   Goings took Willard to a gas station, then a bar in Wilmington.   Willard sought help from two women at the bar and received aid from the bartenders.   Willard stated that "[i]t turned into a physical altercation in the way he was shoving me out of the bar, trying to get me back into my car."   The Wilmington police were called, but they have not pursued charges against Goings related to this incident.

{¶ 5} Willard then began receiving threatening and harassing messages, and she believed they were coming from Goings.   The messages promised to kill her, to "put me in a field like they had planned to," and to kill her six-year-old child.   Willard testified that

the sender knew she was providing information to the Wilmington police and that the messages "were getting angrier and angrier every day so every day the messages got worse. They became more consistent." She said that every time she blocked the number, she would get more texts and phone calls, sometimes five minutes later. Williard testified that "it just consumed my life for a while of being threatened and just berated by him."

{¶ 6} On December 1, 2023, Willard sought and received an ex parte protection order against Goings. Willard told Goings's sister about it, believing that they were friends and that she was a "safe" person with whom to talk. Afterwards, around 4:12 p.m., she received more messages, expressing anger about the protection order and threatening to kill her and her child. The messages read:

When I find you I promise I will kill u u wack ass hoe. U will die a miserable

death by my hand I promise you that

U thinkin u safe an shit with those piggies

Deadass wrong hoe.

I hope you and that kid dies with holes bigger than shit in yo heads

Thinking this PO will save you HA

I'll f*ckin drown you in yo own blood. Watch you gurgling on it an shit.

I'll follow u till the end of the earth till I catch u ass slippin

Gettin my unc locked up

We all goin get yo fat ass and END it hoe.

Watch you're back. I promise on my child and my life yo life is in my hands

Period

I will find you and whip you off this earth.   Time will tell who really plays. . .

(Misspellings in original.)   State's Ex. 1.

{¶ 7} At approximately 4:30 p.m. that same day, Willard went to the Xenia Police Department and spoke with Officer Alexandria Mumpower.   The officer described Willard as very upset and afraid; Willard was shaking and her voice was cracking.   Willard herself testified that she was scared for her life and the lives of her mother and child.

{¶ 8} Willard told Officer Mumpower that she was receiving threatening text messages and showed them to the officer.   Willard said that an acquaintance, Goings, had sent her multiple text messages that threatened to kill her.   Willard explained that she had been living at a residence in Wilmington with some people, that she had gone to the police about illegal drug activities there, and that people had been arrested and charged for some of those behaviors.   Willard believed Goings was threatening her because of this, specifically about his uncle, who was mentioned in the text messages.

{¶ 9} Willard emailed a screenshot of some of the messages to Officer Mumpower so she could print them.   The officer testified that the image was consistent with the text messages she had seen on Willard's phone.

{¶ 10} Willard informed Officer Mumpower that Goings had assaulted her and that she had filed for a protection order against him.   Mumpower communicated with dispatch to determine whether it had been served on Goings.   The dispatcher confirmed that they had a paper copy of the protection order, but Goings had not yet been served with it, and it had not yet been entered into LEADS.   Officer Mumpower attempted to call Goings at

the number from the text messages, but no one answered and she could not leave a voicemail. She did not confirm whether Goings had an uncle who had recently been arrested.

**{¶ 11}** Willard continued to receive more threatening messages, multiple times on multiple days. The messages promised to kill her and indicated that he was following her. She testified that, every time she received texts, she got them "the same way, the same type of language, the same type of threats, the same type of sickening, twisted ways." The texts scared her, particularly when she realized that she and her child were actually being followed.

**{¶ 12}** On December 4, 2023, Willard returned to the Xenia Police Department to report that Goings had violated the protection order. She spoke with Officer Ryan Linnell and showed him text messages that threatened to kill her and her son. Willard told the officer that she had previously filed a report with Officer Mumpower. Officer Linnell obtained a copy of the text messages and created a supplemental report. The messages from 2:23 p.m. on December 4 read:

> Ayo u keep running to them cops you gonna be dead before you know it hoe
>
> [Williard:] Who's this?
>
> Who do you think hoe
>
> [Willard:] Chewy? Lmao please leave me alone
>
> Of course it's chew bitch 😉 who else would it be. You ain't gonna die by anyone else but me I'll tell you that

It will be my pleasure to take yo life

Jeremy locked up because of U hoe

All my peoples being locked up now

U thinking u slick and shit

(Misspellings in original.) State's Ex. 2.

**{¶ 13}** Officer Linnell also called the number that sent the text messages, and he received no answer.   When asked why there was no investigation to determine where the text messages came from, Officer Linnell responded:

So this was a continuation of a report that had already been filed.   This

victim had received hundreds of text messages and all of the text messages

that I had seen had a consistent story and theme.   He also referenced his

uncle as Jeremy being locked up because of her actions, which leads into

it being Chew or Chewy because she said his uncle was named Jeremy.

Officer LInnell further indicated that the text messages had come from "a bunch of different numbers that when you called them, they wouldn't come back to anything."

**{¶ 14}** On December 8, 2023, Goings was charged by complaint with aggravated menacing (Counts 1 and 2), menacing by stalking (Count 3), and telecommunications harassment (Count 4), all misdemeanors of the first degree.   The matter proceeded to a bench trial during which the State presented the testimony of Willard and the two police officers, as well as exhibits showing the quoted text messages.

**{¶ 15}** After Goings's motion for an acquittal pursuant to Crim.R. 29(A) was denied, Goings testified on his own behalf.   He denied assaulting Willard and provided a different

version of the events on November 22, 2023. He indicated that, although he had three sisters, none of them had told him that Willard had gotten a protection order against him. Goings further stated that he had an uncle, but the uncle had been incarcerated for the past two and a half to three years. Finally, Goings acknowledged that most people know him as Chewy, but he denied texting or trying to text Willard; he stated that he had blocked her number and all forms of social media, and he did not know who had sent the texts.

{¶ 16} After closing arguments, the trial court found Goings guilty of all counts and ordered a presentence investigation.

{¶ 17} On January 30, 2024, the trial court sentenced Goings on Count 1 to 180 days in jail, with 90 days suspended and credit for 53 days, plus a $250 fine. On the remaining counts, the trial court imposed 180 days in jail, all of which were suspended, and ordered Goings to pay fines of $200 (Count 2), $150 (Count 3), and $100 (Count 4). On all counts, Goings was sentenced to two years of community control and ordered to pay court costs. Goings was transported back to jail to serve the remaining 37 days of his sentence on Count 1. Goings subsequently asked the trial court to stay his sentence pending appeal, but the court denied the motion.

{¶ 18} Goings appeals from the trial court's judgment, raising two assignments of error, which we will address in reverse order.

## II. Denial of Crim.R. 29 Motion

{¶ 19} In his second assignment of error, Goings claims that the trial court erred by overruling his Crim.R. 29(A) motion for acquittal. He argues that the State failed to present sufficient evidence that the text messages came from him.

{¶ 20} When reviewing the denial of a Crim.R. 29(A) motion, an appellate court applies the same standard as is used to review a claim based on the sufficiency of the evidence. *State v. Page*, 2017-Ohio-568, ¶ 7 (2d Dist.), citing *State v. Sheppeard,* 2013-Ohio-812, ¶ 51 (2d Dist.). "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2009-Ohio-525, ¶ 10 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

{¶ 21} In reviewing the trial court's denial of a Crim.R. 29(A) motion at the end of the State's case, we consider only the evidence that had been presented prior to the motion. *State v. Jackson*, 2022-Ohio-2805, ¶ 9 (2d Dist.); *State v. Powell*, 2018-Ohio-4693, ¶ 22 (2d Dist.), citing *Sheppeard* at ¶ 51. For Crim.R. 29(A) motions made after the defense's evidence, we consider all of the evidence admitted at trial. *State v. Stone*, 2024-Ohio-177, ¶ 9 (2d Dist.).

{¶ 22} We note that, in his other assignment of error, Goings challenges the trial court's admission of the text messages. However, when reviewing claims based on the sufficiency or manifest weight of the evidence, we are required to consider all the evidence admitted at trial, regardless of whether it was admitted erroneously. *See, e.g.,*

*State v. Fleming*, 2022-Ohio-1876, ¶ 27 (2d Dist.), citing, *e.g., State v. Brewer*, 2009-Ohio-593.   Accordingly, we must consider the disputed text messages in conducting our analysis.

{¶ 23} The main issue at trial was the identity of the person sending the threatening and harassing messages.   During Willard's direct examination, the prosecutor asked why she believed the messages were coming from Goings.   Willard responded with several reasons.   First, she stated that the messages "follows the pattern of messages I did receive prior; and how he would talk in person, it follows his – his pattern."   Willard stated that Goings had also texted the "exact same threats" that he had previously said to her in person.

{¶ 24} Willard also testified that the messages made references to things that only he would know, such as the plan he had and her getting his uncle locked up.   When asked if she knew who Jeremy was, Willard stated that he was the owner of the house and that she knew he was currently incarcerated.

{¶ 25} Additionally, in the set of text messages shown to Officer Linnell (State's Exhibit 2), Willard had asked who was writing to her.   The writer responded that it was "Chew."   Willard testified that she knew Goings had used the nickname "Chewy" for a long time; she indicated that everyone called him that, including herself, and that he used that nickname on social media.

{¶ 26} Willard was not surprised to receive messages from multiple numbers. She indicated that Goings had multiple phones and that it was easy and fast to make new phone numbers on TextNow and Google.   Willard acknowledged that Goings "could

have had people [sending messages] for him but it was always coming from Dashawn."

**{¶ 27}** Willard testified that she could not imagine anyone else sending her those texts. She said that the other people in the house had stopped talking with her, whereas Goings was "persistently talking to me. He was the only one that stayed talking to me. Everyone else left me alone." Finally, Willard testified that she had not received these types of communications prior to meeting Goings and had not received them since Goings was incarcerated.

**{¶ 28}** Construing the evidence in the light most favorable to the State, there was sufficient evidence to prove that Goings sent threatening and harassing text messages to Willard. The trial court did not err in overruling Goings's motion for acquittal pursuant to Crim.R. 29(A).

**{¶ 29}** Goings's second assignment of error is overruled.

### III. Admission of Text Messages

**{¶ 30}** In his first assignment of error, Goings claims that the trial court's admission of the text messages was improper because the text messages were not properly authenticated. He emphasizes that Williard had only known him for a short time before receiving the text messages and she could not establish that he sent the messages.

**{¶ 31}** Authentication is governed by Evid.R. 901. "Evid.R. 901(A) requires, as a condition precedent to the admissibility of evidence, a showing that the matter in question is what it purports to be." *State v. Simmons*, 2011-Ohio-2068, ¶ 12 (2d Dist.); *State v. Hatfield*, 2022-Ohio-148, ¶ 84 (2d Dist.). "The threshold standard for authenticating evidence is low, meaning that the party seeking to introduce the disputed evidence need

only demonstrate 'a reasonable likelihood that the evidence is authentic.' " (Citations omitted.) *State v. Shropshire*, 2020-Ohio-6853, ¶ 11 (2d Dist.).

{¶ 32} Evid.R. 901(B) provides examples of several ways that the authentication requirement may be satisfied. The most common method is oral testimony that a matter is what it is claimed to be under Evid.R. 901(B)(1). *E.g., State v. Quarles*, 2015-Ohio-3050, ¶ 34 (2d Dist.); *State v. Renner*, 2013-Ohio-5463, ¶ 30 (2d Dist.). We have noted that, "in most cases involving electronic print media, i.e., texts, instant messaging, and e-mails, the photographs taken of the print media or the printouts of those conversations are authenticated, introduced, and received into evidence through the testimony of the recipient of the messages." *State v. Irwin*, 2015-Ohio-195, ¶ 21 (2d Dist.), quoting *State v. Roseberry*, 2011-Ohio-5921, ¶ 75 (8th Dist.).

{¶ 33} In this case, Willard testified that she went to the Xenia police multiple times regarding the threatening and harassing text messages that she had received. She indicated that the officers were only interested in having copies of the threatening messages. Willard testified that she sent screenshots of text messages to the officers via email.

{¶ 34} Officer Mumpower testified that she had viewed text messages on Willard's phone and that Willard had emailed her a photo of some messages. Without objection, Officer Mumpower identified State's Exhibit 1 as a true and accurate image of the text messages that she had seen on Willard's phone. Officer Linnell similarly testified that he had viewed text messages that Willard had received and that he obtained a copy of the messages. When asked about State's Exhibit 2, Officer Linnell stated that the exhibit

showed a text message that he had personally viewed. The officers' testimony was sufficient to establish that Exhibits 1 and 2 were authentic copies of the text messages that Willard received.

**{¶ 35}** Goings argues that, for the messages to be admissible, the State was required to establish the identity of the sender of the messages and it failed to do so. However, Willard's testimony demonstrated that Goings had texted the threatening and harassing messages to her. *See Ellis v. Skinner*, 2022-Ohio-4793, ¶ 83 (11th Dist.) ("Statements from text messages are properly authenticated and are admissible as a party-opponent admission when the recipient of the messages identifies the messages as coming from the defendant.").

**{¶ 36}** Goings's first assignment of error is overruled.

### III. Conclusion

**{¶ 37}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

LEWIS, J. and HUFFMAN, J., concur.