[Cite as *State v. Hasbrouck*, 2025-Ohio-5816.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 25AP-82 |
| | | (C.P.C. No. 24CR-2396) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Chad E. Hasbrouck, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 30, 2025

**On brief:** *Shayla D. Favor*, Prosecuting Attorney, *Paula M. Sawyers*, and *Michael A. Walsh*, for appellee. **Argued:** *Michael A. Walsh*.

**On brief:** *David K. Greer*, for appellant. **Argued:** *David K. Greer*.

APPEAL from the Franklin County Court of Common Pleas

DINGUS, J.

{¶ 1} Defendant-appellant, Chad E. Hasbrouck, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of one count of felonious assault. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} By indictment filed April 30, 2024, plaintiff-appellee, State of Ohio, charged Hasbrouck with one count of felonious assault, in violation of R.C. 2903.11, a second-degree felony. Hasbrouck entered a plea of not guilty, and the matter was tried to a jury in November 2024. As pertinent to this appeal, the following evidence was adduced at trial.

{¶ 3} Judie Beasley, who lived on Findley Avenue in Columbus and was a neighbor of both Hasbrouck and J.B., testified that the first time she met Hasbrouck, he was "sitting on the sidewalk by a tree kind of digging in the dirt and putting things on or in the tree . . .

trying to make some kind of, like . . . Peter Pan theme on the tree." (Nov. 13, 2024 Tr. Vol. II at 250.) The same day, Hasbrouck asked for a cigarette and Beasley provided one to him. A few days later, he asked for another cigarette and Beasley declined. Then, a few days after that, Beasley's flowerpots were stolen. Based on her observations and interactions with Hasbrouck, she considered him to possibly have some mental health issues, and this circumstance had been discussed with other neighbors. Neighbors commonly referred to Hasbrouck as "creepy." *Id.* at 286. Sometimes Beasley noticed that Hasbrouck "said things out loud" to himself "that didn't make a lot of sense." *Id.* And at times, Hasbrouck acted in "a harassing nature towards other neighbors," but he had not been physically threatening or violent against anyone prior to the event at issue. *Id.* at 288. Beasley characterized J.B. as "a large man" and Hasbrouck as "[m]aybe average" size. *Id.* at 287.

{¶ 4} On April 20, 2024, at approximately 6:00 p.m., Beasley and J.B. were sitting on their shared porch talking when Beasley noticed Hasbrouck "walking down the street . . . saying stuff," toward them including "dirty bitch," "slaveholders," and "[n-word]." *Id.* at 262-263. Beasley said to Hasbrouck, "What'd you say?" Then Hasbrouck did "some kind of Kung Fu kick." *Id.* at 265. Hasbrouck, who was then on the sidewalk in front of the porch, continued on "with the N-word and different racial slurs with [J.B.]." *Id.* at 266-267. Hasbrouck and Beasley began to argue and then Hasbrouck argued with J.B. J.B. stepped down off the porch and continued to argue with Hasbrouck on the sidewalk. Hasbrouck said J.B. "was a slaveholder, being a pedophile, he had raped some girls." *Id.* at 268. J.B. "told Mr. Hasbrouck to shut his mouth a few times, told him that what he was saying wasn't true." *Id.* at 269. Then Hasbrouck turned away, walked up to his residence, opened the front door, "reached in," and "turned around and came back running off of his porch and back into the middle of the road, and lunged at [J.B.]." *Id.* at 297, 269. "[J.B.] started pushing him back, and they were kind of going back and forth with hitting each other." *Id.* at 270. Other neighbors heard the commotion and came outside. "They were real frantic because they seen blood. They were screaming that Mr. Hasbrouck had a knife and that [J.B.] had been stabbed." *Id.* at 271. Once J.B. pinned Hasbrouck, another neighbor "removed the two weapons that [Hasbrouck] had." *Id.*

{¶ 5} Rebecca Haight testified that one of her neighbors on Findley Avenue was "scrawny," had oily hair, and "was always kind of lurking around some things on his front porch." *Id.* at 306-307. Haight and her roommates would try to avoid interacting with him

because he would say "off-the-wall stuff" and generally made them feel uncomfortable. *Id.* at 316. In a "[v]ery strange" first encounter with him, the man asked Haight if they could go together to the beach with her dog and swim. *Id.* at 317. On April 20, 2024, Haight was walking down the street when she saw J.B., whom she knew as Aiulurus, arguing with the scrawny man. She took an indirect route home to avoid them. When the arguing men came back into her sight, Aiulurus had pinned the man to the ground and was bleeding profusely. Someone unknown to her assisted Aiulurus and gave him a sweatshirt to stop the bleeding.

{¶ 6} J.B. testified that he lived in the duplex next to Beasley, and Hasbrouck lived "kind of catty-corner" from them on Findley Avenue. *Id.* at 333. In October 2023, J.B. and Beasley were visiting on their porch when Hasbrouck, standing on the street, shouted obscenities at J.B., including "you fucking [n-word], you're going to fucking die, you're not shit." *Id.* at 338. J.B. yelled and cursed at him, but nothing else happened between them. J.B. contacted the police, and he reported the incident. J.B. indicated to the police that he was not afraid of Hasbrouck, but he did report his impression that Hasbrouck may have mental health issues.

{¶ 7} Between the October 2023 incident and April 19, 2024, J.B. had no interaction with Hasbrouck, but he did observe Hasbrouck "yelling out and saying things to other neighbors." *Id.* at 343. In those instances, J.B. took no action. On April 19, 2024, J.B. was sitting on his porch when Hasbrouck started to yell at him, stating "You fucking [n-word]. I'm going to hang you from a tree. You piece of shit. You're not going to do anything. I'm a QAnon Neanderthal." *Id.* at 347. Then Hasbrouck walked to his residence, continuing to shout obscenities. J.B. did not respond.

{¶ 8} On April 20, 2024, at approximately 6:00 p.m., J.B. and Beasley were sitting on their porch. Beasley got up to throw some trash away in a trashcan just inside the fence to the yard when Hasbrouck approached them. Hasbrouck and Beasley started to scream at each other at the fence, with Hasbrouck saying, "You fucking [n-word] lover" and "You fucking bitch." *Id.* at 351. Then Hasbrouck did a "Power Ranger back flip." *Id.* J.B. stood up and started to yell at Hasbrouck, telling him "[Y]ou're speaking to her, crazy. Talk to me." *Id.* at 354. J.B. also said, "I got your number, you fucking creep asshole." *Id.* at 402. Hasbrouck began "to retreat," but loudly said, "I'll hang you from a tree." *Id.* at 354. J.B. exited the fence, and Hasbrouck went to his residence. Completely unarmed, J.B. followed Hasbrouck but remained on the street and did not enter Hasbrouck's property or even get

to the sidewalk in front of his property. Hasbrouck said he "has something for" J.B., and he leaned down to retrieve something from behind the wall to the front porch. *Id.* at 356. Then Hasbrouck "runs off of the porch" and "attacks" J.B., who braced himself and applied his years of Muay Thai training. *Id.* Hasbrouck swung at J.B. but missed, and J.B. hit him onto a pickup truck. J.B. "pulled him off of it," and they fought. *Id.* at 357. J.B. felt a "prick" and he began to see blood. *Id.* at 358. He was able to get on top of Hasbrouck, who was stabbing him on his chest, trying to carve the sign of "Thor," and saying he would be sacrificed. *Id.* at 359.

{¶ 9} At 6 feet, 5 inches tall, and 250 pounds, J.B. acknowledged at trial that he was much bigger than Hasbrouck. J.B. was able to restrain Hasbrouck, who was holding a knife and a railroad spike. A neighbor was able to remove the knife and railroad spike from Hasbrouck's hands. The police arrived, and Hasbrouck screamed "Help!" *Id.* at 363. J.B. was taken by ambulance to the hospital where he underwent emergency surgery for the cut to his neck.

{¶ 10} Another neighbor, Thomas Holbert, testified that on the day of the incident, he was in his upstairs bedroom when he began to hear angry shouting outside. Holbert looked out his window and saw Hasbrouck and J.B. yelling at each other. Holbert tried to avoid being seen by Hasbrouck because of an unprovoked and upsetting incident with him in September 2023. Although Holbert did not testify regarding the details of the incident, he stated it made him very "afraid" to interact with Hasbrouck, and he therefore would try to avoid any interaction if possible. *Id.* at 439. Holbert went downstairs and could hear what sounded like a physical fight. He then went outside and could see J.B. and Hasbrouck fighting in the middle of the street. J.B. knocked Hasbrouck to the ground and pinned him. At J.B.'s urging, Holbert was able to grab the bloody knife and railroad spike from Hasbrouck's hands.

{¶ 11} Officer Emily Geier, with the Columbus Division of Police, testified that after Hasbrouck was arrested and placed in the police vehicle, he was singing and making various statements, including being in possession of a knife and railroad spike, how he had just stabbed someone, something about the Ku Klux Klan, and the difference "between a negro and a word that I cannot say." (Nov. 14, 2024 Tr. Vol. III at 486.) Hasbrouck also said he was the victim and was concerned about getting medical attention for the small abrasions

on his hand, which only required a "Band-Aid." *Id.* at 487. Officer Geier considered Hasbrouck's behavior after the arrest to be abnormal.

{¶ 12} Detective Bryan Brumfield, with the Columbus Division of Police, testified that Hasbrouck waived his rights and was interviewed at police headquarters. Hasbrouck did not testify at trial, but his video-recorded interview with Detective Brumfield and another detective was admitted into evidence. During the interview, Hasbrouck repeatedly asserted that he was the victim in the altercation. Hasbrouck stated he retrieved the knife and railroad spike at his residence because J.B. threatened to "butcher" him, J.B. is a significantly larger man than him, and J.B. moved toward him in the street during the confrontation. (State's Ex. 62 at 06:04.) However, he also indicated that J.B. did not have any visible weapon and was in the street when they physically engaged. Throughout the interview, Hasbrouck made "very peculiar" statements (as characterized by Detective Brumfield at trial), such as calling the railroad spike a "crucifixion stake" and the detectives' questioning "vectoring." (State's Ex. 62 at 06:04, 06:44, 25:19.) Additionally, at least twice he exhibited escalating anger during the questioning, including forcefully pulling against the seat to which he was handcuffed.

{¶ 13} Following deliberations, the jury found Hasbrouck guilty of felonious assault as charged in the indictment. For Hasbrouck's conviction, the trial court sentenced him to an indefinite term of four to six years in prison.

{¶ 14} Hasbrouck timely appeals.

## II. Assignments of Error

{¶ 15} Hasbrouck assigns the following five assignments of error for our review:

> I. The trial court erred and/or committed plain error in admitting unrelated other acts, character, and inflammatory evidence, when proof of motive is not relevant to the elements of felonious assault. The trial court also committed plain error by not instructing the jury to disregard a comment by a state's witness implying appellant stole her flower pots. He was therefore denied a fair trial and due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution and Article I, §16 of the Ohio Constitution.
>
> II. The trial court committed plain error by allowing prosecutorial misconduct throughout the trial.
>
> III. Appellant was denied his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments of the

United States Constitution, and Article I, §10 of the Ohio Constitution, when his trial counsel failed to object to other acts evidence and allowed prosecutorial misconduct without objection.

IV. The judgment is against the manifest weight of the evidence because the jury lost its way considering improperly-admitted evidence and therefore was unable to properly weigh the evidence supporting self-defense.

V. The trial court committed plain error by not instructing the jury on aggravated assault.

## III. Discussion

### A. First Assignment of Error – Other-Acts Evidence

{¶ 16} Hasbrouck's first assignment of error alleges the trial court erred in admitting other-acts evidence and in not instructing the jury to disregard testimony of a witness relating to stolen flowerpots. This assignment of error is not well-taken.

{¶ 17} Evid.R. 404(B)(1) states that "[e]vidence of other crime, wrong, or act is not admissible to prove [the appellant]'s character in order to show that on a particular occasion the person acted in accordance with the character." "This type of evidence is commonly referred to as 'propensity evidence' because its purpose is to demonstrate that the accused has a propensity or proclivity to commit the crime in question." *State v. Hartman*, 2020-Ohio-4440, ¶ 21. Such evidence, however "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid.R. 404(B)(2).

{¶ 18} In *State v. Williams,* 2012-Ohio-5695, ¶ 19, the Supreme Court of Ohio instructed courts to "conduct a three-step analysis" to determine whether other-acts evidence is admissible under Evid.R. 404(B). "The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Williams* at ¶ 20, citing Evid.R. 401. "The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)." *Id.* Those purposes include "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid.R. 404(B)(2). "The third step is to consider whether the

probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." *Williams* at ¶ 20, citing Evid.R. 403. Pursuant to Evid.R. 403(A), even relevant "evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶ 19} "When a court determines that other-acts evidence should be admitted, it must take steps to minimize the danger of unfair prejudice inherent in the use of such evidence and to ensure that the evidence is considered only for a proper purpose." *Hartman* at ¶ 34. This includes a contemporaneous limiting instruction and a final jury instruction, "tailored to the facts of the case," on the purposes for which such evidence may be used. *State v. Echols*, 2024-Ohio-5088, ¶ 46. Although a court must give a limiting instruction upon request, this " 'does not mean the court should sua sponte issue such an instruction any time other-acts evidence is used.' " *Id.* at ¶ 47, quoting *Hartman* at ¶ 67. "Indeed, '[d]epending on the nature of the other-acts evidence and the context in which it is used, defense counsel may as a matter of strategy wish to avoid highlighting the evidence for the jury.' " *Id.*, quoting *Hartman* at ¶ 67.

{¶ 20} This court analyzes the admission of other-acts evidence under a mixed standard of review. Generally, the admissibility of other-acts evidence, pursuant to Evid.R. 404(B), is a question of law that must be reviewed using a de novo standard of review. *Hartman* at ¶ 22. But if the other-acts evidence was offered for a permissible purpose, the determination of whether to then admit the evidence—after weighing its probative value against its prejudicial effect—is reviewed for an abuse of discretion. *Hartman* at ¶ 30; *State v. Graham*, 2020-Ohio-6700, ¶ 72. An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). If objected to, erroneously admitted evidence is reviewed for harmless error. "Error in the admission of other acts [evidence] is harmless when there is no reasonable possibility that the [evidence] contributed to the accused's conviction." (Quotation marks deleted and citation omitted.) *State v. Tench*, 2018-Ohio-5205, ¶ 177.

{¶ 21} In the absence of an objection, we review for plain error. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). For an error to be a "plain error" under Crim.R. 52(B), it must satisfy three prongs: (1) there must be an error, meaning a deviation from a legal rule, (2) the error must be "plain," meaning an "obvious" defect in the trial

proceedings, and (3) the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial. *State v. Barnes*, 2002-Ohio-68, ¶ 20. Thus, an appellate court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice. *State v. Pilgrim*, 2009-Ohio-5357, ¶ 58 (10th Dist.), citing *State v. Diar*, 2008-Ohio-6266, ¶ 139. To satisfy the prejudice prong of a plain-error analysis, an appellant must demonstrate a reasonable probability that the plain or obvious error resulted in prejudice. *State v. Gooch*, 2025-Ohio-4595, ¶ 24 (10th Dist.), citing *State v. Rogers*, 2015-Ohio-2459, ¶ 22. This probability must be "sufficient to undermine confidence in the outcome of the proceeding." (Quotation marks deleted and citations omitted.) *Gooch* at ¶ 24. And even if plain error exists, an appellate court has discretion in deciding whether to correct it. *Rogers* at ¶ 23.

{¶ 22} Here, the other-acts evidence at trial that Hasbrouck challenges on appeal generally relates to two prior verbal arguments between Hasbrouck and J.B., Hasbrouck's strange behavior, and testimony that suggested that he stole flowerpots. J.B. testified that, in October 2023, he and Hasbrouck engaged in a verbal confrontation, which included Hasbrouck shouting at J.B. "you fucking [n-word], you're going to fucking die, you're not shit." (Nov. 13, 2024 Tr. Vol. II at 338.) The day before their physical altercation, Hasbrouck again verbally confronted J.B., yelling "You fucking [n-word]. I'm going to hang you from a tree. You piece of shit. You're not going to do anything. I'm a QAnon Neanderthal." *Id*. at 347. Additionally, multiple witnesses testified at trial regarding Hasbrouck's abnormal behavior, which caused them to avoid interacting with him or to be "afraid" of him. *Id*. at 439. Lastly, Beasley testified that, a few days after she declined Hasbrouck's request for a cigarette, "flower pots come up missing out of my front yard." *Id*. at 251. Hasbrouck's counsel objected to some, but not all, of the other-acts evidence.

{¶ 23} Irrespective of whether Hasbrouck's counsel preserved all these evidentiary issues for appeal, Hasbrouck fails to demonstrate prejudicial error in the admission of the other-acts evidence.

{¶ 24} Insofar as any other-acts evidence was erroneously admitted into evidence, or the trial court erred in not instructing the jury to disregard the flowerpot evidence, it was harmless error. Hasbrouck asserts that the admission of this evidence was not harmless error because had this evidence not been admitted, he may have decided to take the stand in support of his self-defense claim. Hasbrouck also argues he was prejudiced because the

jury's review should have been limited to whether the state disproved his self-defense claim beyond a reasonable doubt, not whether he had engaged in other bad or strange conduct. We are unpersuaded.

{¶ 25} First, we note that while Hasbrouck asserts the presentation of other-acts evidence impacted his decision not to testify at trial, the trial evidence included his statements at the police interview, wherein he went into great detail, from his perspective, about his interaction with J.B. on April 20, 2024. Second, insofar as Hasbrouck alleges that he was prejudiced by testimony about his yelling at J.B. in October 2023, as set forth above, this testimony is essentially cumulative to the other testimony relating to more recent conduct and his motive in attacking J.B. Third, concerning the verbal confrontation evidence and the other challenged other-acts evidence, the trial court instructed the jury that the other-acts evidence could not be considered "to prove the character of the defendant in order to show that he acted -- that he acted in conformity with that character. If you find evidence of other acts is true and the defendant committed them, you may only consider that evidence for the limited purpose of whether it proves the defendant's motive to commit the offense charged in this trial." (Nov. 14, 2024 Tr. Vol. III at 646-647.) A jury is presumed to follow the instructions of the court, including limiting instructions. *State v. Hicks*, 2020-Ohio-548, ¶ 23 (10th Dist.), citing *State v. Shipley*, 2013-Ohio-4055, ¶ 62 (10th Dist.). The jury instructions reduced any danger that the jury would improperly consider other-acts evidence as demonstrating Hasbrouck's character in determining the central issue of whether the state proved Hasbrouck did not act in self-defense. Fourth and finally, the evidence demonstrating that Hasbrouck committed felonious assault—and did not act in self-defense—was largely undisputed and overwhelming, as discussed in our analysis below concerning his manifest weight argument. Thus, we find no prejudicial error concerning the other-acts evidence.

{¶ 26} Accordingly, we overrule Hasbrouck's first assignment of error.

## B. Second Assignment of Error – Prosecutorial Misconduct

{¶ 27} Hasbrouck's second assignment of error contends the trial court plainly erred in allowing prosecutorial misconduct at trial. This assignment of error is not well-taken.

{¶ 28} Courts afford prosecutors wide latitude in closing arguments, and prosecutors may draw reasonable inferences from the evidence at trial, commenting on those inferences during closing arguments. *State v. Hunt*, 2013-Ohio-5326, ¶ 18 (10th

Dist.). The test for prosecutorial misconduct in closing arguments "is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Smith*, 14 Ohio St.3d 13, 14 (1984), citing *United States v. Dorr*, 636 F.2d 117 (5th Cir. 1981). That is, the "relevant question is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Quotation marks deleted and citations omitted.) *State v. Wilks*, 2018-Ohio-1562, ¶ 172. *See State v. Wilkerson*, 2002-Ohio-5416, ¶ 38 (10th Dist.), quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982) (" '[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.' "); *State v. Drayer*, 2004-Ohio-6120, ¶ 18 (10th Dist.) ("Even if the prosecutor's statements during closing arguments are improper, reversal based upon those statements is warranted only if the statements permeate the entire atmosphere of the trial.").

{¶ 29} Hasbrouck categorizes the instances of alleged prosecutorial misconduct as either the prosecutor exceeding the trial court's ruling regarding permissible other-acts evidence or name-calling in statements to the jury. Hasbrouck concedes he did not object to the prosecutor's statements at trial and thus has waived all but plain error. Our standard of review for plain error is set forth above, but we note that, specific to allegations of prosecutorial misconduct, "[u]nder a plain error standard, a reviewing court asks whether a defendant would not have been convicted in the absence of the improper conduct." (Quotation marks deleted and citations omitted.) *State v. Lipkins*, 2017-Ohio-4085, ¶ 23 (10th Dist.).

{¶ 30} As to the other-acts evidence, Hasbrouck argues the prosecutor improperly asked questions eliciting answers addressing circumstances in a timeframe the trial court earlier indicated would not be allowed. We construe this allegation of prosecutorial misconduct as to the other-acts evidence as a reframing of Hasbrouck's challenge to the admission of evidence set forth in his first assignment of error. As discussed above as to Hasbrouck's first assignment of error, we have found no prejudicial error as to the admission of other-acts evidence. Therefore, we likewise find as unavailing his prosecutorial misconduct claim relating to other-acts evidence.

{¶ 31} As to the prosecutor's name-calling, Hasbrouck asserts the prosecutor improperly "alluded to [Hasbrouck] in voir dire as being mentally ill," called him "Crazy

Chad" during opening statements and closing arguments and called him a "pathetic human being" during closing arguments. (Appellant's Brief at 26, 27.) Hasbrouck is correct that the prosecutor engaged in this name-calling. During voir dire, the prosecutor stated that the "evidence may circumstantially demonstrate that the defendant in this case has a mental illness." (Nov. 12, 2024 Tr. Vol. I at 70.) In that discussion, the trial court indicated that any evidence of the defendant having a mental health issue would not be a defense, and the state still would need to prove the elements of the offense regardless of any mental health issue. During opening statements, the prosecutor twice referred to Hasbrouck as "Crazy Chad" in discussing the anticipated testimony of Holbert concerning that witness's apprehension to get involved in any altercation with Hasbrouck. (Nov. 13, 2024 Tr. Vol. II at 233.) During closing arguments, the prosecutor stated the jury should not sympathize with Hasbrouck "because he is a pathetic human being who is obviously suffering from terrible mental wiring." (Nov. 14, 2024 Tr. Vol. IV at 593.) And the prosecutor again referred to Hasbrouck as "Crazy Chad" when discussing Hasbrouck and J.B. trading verbal barbs before the altercation. *Id.* at 636.

{¶ 32} Hasbrouck argues these comments dehumanized him before the jury and affected the outcome because his counsel was "sidetracked" during opening statements. (Appellant's Brief at 26.) Hasbrouck contends his counsel was forced to address his mental health in opening statements instead of discussing his self-defense claim. We are unpersuaded. While some of the prosecutor's comments connected to the evidence of Hasbrouck's observed strange or abnormal behavior were improper and offensive, such as calling him "Crazy Chad," we cannot conclude that Hasbrouck did not receive a fair trial due to these comments. In instructing the jury before deliberations, the trial court explained that statements or arguments of counsel during voir dire, opening statements, and closing arguments, are not evidence to be considered in determining Hasbrouck's guilt. And even though Hasbrouck's counsel was compelled to address, during opening statements, the mental health issue based on the prosecutor's opening statements, his counsel in fact did contend during those statements that he acted in self-defense, asserting in part that he was forced to protect himself from J.B.'s aggression. Lastly, the evidence proving Hasbrouck did not act in self-defense and committed felonious assault was overwhelming, as discussed below.

{¶ 33} Because we find no plain error arising from prosecutorial misconduct, we overrule his second assignment of error.

## C. Third Assignment of Error – Ineffective Assistance of Counsel

{¶ 34} Hasbrouck's third assignment of error contends he received ineffective assistance of trial counsel because his counsel did not object to prosecutorial misconduct or the admission of other-acts evidence. This assignment of error lacks merit.

{¶ 35} To prevail on a claim of ineffective assistance of counsel, Hasbrouck must satisfy a two-prong test. First, he must demonstrate that his counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This first prong requires Hasbrouck to show that his counsel committed errors which were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* If Hasbrouck can so demonstrate, he must then establish that he was prejudiced by the deficient performance. *Id.* To show prejudice, Hasbrouck must establish there is a reasonable probability that, but for his counsel's errors, the result of the trial would have been different. A "reasonable probability" is one sufficient to undermine confidence in the outcome of the trial. *Id.* at 694. In considering claims of ineffective assistance of counsel, courts review these claims with a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *State v. Conway*, 2006-Ohio-2815, ¶ 101.

{¶ 36} To succeed on a claim of ineffective assistance of counsel based on counsel's failure to file an objection, an appellant must demonstrate that the objection had a reasonable probability of success. *State v. Jones*, 2019-Ohio-2134, ¶ 52 (10th Dist.). Additionally, when a plain error argument fails, "the issue cannot be reversed by claiming ineffective assistance of counsel." (Quotation marks deleted and citations omitted.) *State v. Young*, 2020-Ohio-462, ¶ 103 (10th Dist.). *See State v. Rogers*, 2015-Ohio-2459, ¶ 22 (plain error review involves "the same deferential standard for reviewing ineffective assistance of counsel claims").

{¶ 37} Here, Hasbrouck contends his trial counsel was ineffective by failing to object to the prosecutor's name-calling and statements relating to his mental health and to the trial court's admission of certain other-acts evidence. This argument fails. In reviewing Hasbrouck's first and second assignments of error, which alleged prosecutorial misconduct and the erroneous admission of other-acts evidence, we found that Hasbrouck failed to

demonstrate any prejudicial error as to the admission of other-acts evidence (whether objected to or not), and no plain error concerning the alleged prosecutorial misconduct. Consequently, we likewise find that Hasbrouck's ineffective assistance claim, based on the same issues, fails.

{¶ 38} For these reasons, we overrule Hasbrouck's third assignment of error.

## D. Fifth Assignment of Error – Jury Instructions

{¶ 39} For ease of discussion, we analyze Hasbrouck's fourth and fifth assignments of error out of order. Hasbrouck's fifth assignment of error contends the trial court erred in not instructing the jury on aggravated assault. This assignment of error lacks merit.

{¶ 40} Ordinarily, an appellate court reviews a trial court's refusal to instruct the jury on a lesser-included offense under the abuse of discretion standard. *State v. Ferrell*, 2020-Ohio-6879, ¶ 32 (10th Dist.). But because Hasbrouck did not request an aggravated assault instruction at trial, we review for plain error his contention that the trial court should have given the instruction sua sponte. *Id.*

{¶ 41} Felonious assault is proscribed by R.C. 2903.11(A), which states that no person shall knowingly cause serious physical harm to another or cause, or attempt to cause, physical harm to another by means of a deadly weapon. "Felonious assault is reduced to aggravated assault if the offender is 'under the influence of sudden passion or in a sudden fit of rage . . . brought on by serious provocation occasioned by the victim.'" *State v. Wimpey*, 2019-Ohio-4823, ¶ 12 (6th Dist.), citing R.C. 2903.12(A). Thus, "[t]he difference between aggravated assault (a fourth-degree felony) and felonious assault (a second-degree felony) is serious provocation involving sudden passion or fit of rage." *State v. Perry*, 2025-Ohio-2054, ¶ 65 (10th Dist.).

{¶ 42} Here, the trial centered on whether Hasbrouck acted in self-defense. He claimed he stabbed J.B. during their altercation to protect himself from great harm. During his interview with the detectives, Hasbrouck explained that he feared J.B. was going to kill him and that he retrieved the weapons and stabbed J.B. to defend himself. Based on this evidence and claim, the trial court instructed the jury on self-defense. Hasbrouck did not request, and the trial court did not give, an instruction on aggravated assault.

{¶ 43} Relying on *Wimpey*, Hasbrouck argues it was plain error for the trial court not to also instruct the jury on aggravated assault. While an instruction on aggravated assault based on the mitigating element of provocation is generally incompatible with and

contradictory to a self-defense theory, there may be facts and circumstances where they are compatible. *Compare State v. Jefferson*, 2012-Ohio-2387, ¶ 26 (8th Dist.), w*ith State v. Tubbs*, 2020-Ohio-730, ¶ 47 (7th Dist.), and *State v. Stanley*, 2016-Ohio-7284, ¶ 22 (7th Dist.). *See also State v. Caldwell*, 1998 Ohio App. LEXIS 6220, *18-19 (10th Dist. Dec. 17, 1998), quoting *State v. Thompson*, 1993 Ohio App. LEXIS 1198 (10th Dist. Feb. 23, 1993) (" '[T]he difficulty in attempting to argue both provocation, as is necessary for voluntary manslaughter, and self-defense is that to an extent those defenses are inconsistent.' "). In *Wimpey*, the court found the appellant "presented sufficient evidence of provocation such that a reasonable juror could have rejected his self-defense claim and found him not guilty of felonious assault but guilty of aggravated assault. Because he did so, the trial court was required to give an instruction on aggravated assault. We therefore find plain error in the trial court's failure to give such an instruction." *Wimpey* at ¶ 19.

{¶ 44} Unlike *Wimpey*, in the case at bar, there was insufficient evidence to warrant an aggravated assault instruction, as no evidence was presented at trial reasonably demonstrating that Hasbrouck was seriously provoked to act out of sudden passion or in a fit of rage.

{¶ 45} Hasbrouck asserts that the evidence that J.B. knocked him onto the top of a truck, and then knocked him to the sidewalk, pinning him, demonstrated that he was seriously provoked. But "[n]either a push nor a punch constitutes sufficient provocation to warrant an aggravated assault instruction." *State v. Moore*, 2016-Ohio-8274, ¶ 22 (4th Dist.). *See State v. Evans*, 2006-Ohio-2564, ¶ 64 (4th Dist.) ("As a matter of law, hitting another person does not constitute sufficient provocation to bring about a sudden passion or fit of rage."). And no evidence reasonably demonstrated that Hasbrouck responded to J.B.'s actions under the influence of sudden passion or a sudden fit of rage. Consistent with his statements during the video-recorded interview with detectives, at trial, Hasbrouck claimed self-defense—that he acted out of fear for himself. Under these circumstances, we find the trial court did not plainly err in not giving sua sponte an aggravated assault instruction.

{¶ 46} Accordingly, we overrule Hasbrouck's fifth assignment of error.

## E.  Fourth Assignment of Error – Manifest Weight of the Evidence

{¶ 47} In his fourth assignment of error, Hasbrouck alleges his conviction was against the manifest weight of the evidence because the "jury lost its way considering

improperly-admitted evidence and therefore was unable to properly weigh the evidence supporting self-defense." (Appellant's Brief at VI.) This assignment of error is not well-taken.

{¶ 48} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the [manifest] weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins*, 1997-Ohio-52, ¶ 25, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Determinations of credibility and weight of the testimony are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Thus, the jury may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.), citing *State v. Antill*, 176 Ohio St. 61, 67 (1964). *See State v. Cattledge*, 2010-Ohio-4953, ¶ 6 (10th Dist.), quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984) (noting the jury, or the trial court in a bench trial, " 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony' "); *State v. Guice*, 2019-Ohio-1324, ¶ 29 (10th Dist.) (the trier of fact has a "superior, first-hand perspective in judging the demeanor and credibility of witnesses"). (Quotation marks deleted and citations omitted.)

{¶ 49} An appellate court considering a manifest-weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 2014-Ohio-2501, ¶ 22 (10th Dist.), citing *Thompkins* at ¶ 25. Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at ¶ 25, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 50} In challenging his conviction as being against the manifest weight of the evidence, Hasbrouck argues the jury lost its way because the erroneous admission of certain evidence precluded it from properly weighing the evidence supporting self-defense. He also

contends this is one of the rare cases in which this court should reverse the jury's resolution of the conflicting evidence on the issue of whether he acted in self-defense and remand for a new trial. Lastly, he argues that, even if the evidence did not show that he acted in self-defense, it showed that serious provocation caused him to act under the influence of sudden passion or in a sudden fit of rage. We are unpersuaded.

{¶ 51} Hasbrouck's manifest-weight argument that the jury lost its way by considering improperly admitted evidence is in essence a reframing of his argument that he was prejudiced by the admission of that evidence. First, we note that, in a manifest-weight review, a reviewing court must consider all evidence admitted at trial, "even if it should have been excluded." *State v. Gonzalez*, 2025-Ohio-1201, ¶ 19 (2d Dist.), citing *State v. Goings*, 2025-Ohio-485, ¶ 22 (2d Dist.) ("[W]hen reviewing claims based on the sufficiency or manifest weight of the evidence, we are required to consider all the evidence admitted at trial, regardless of whether it was admitted erroneously."). *State v. Justice*, 2024-Ohio-2574, ¶ 24 (1st Dist.) ("[W]e are required to consider all of the evidence admitted at trial, regardless of whether it was admitted erroneously, when reviewing claims based on the sufficiency or manifest weight of the evidence."). This means that "even if the testimony was erroneously admitted, under our review, we must still consider it." *Id.* Thus, because the jury considered all the admitted evidence, Hasbrouck's manifest weight challenge requires this court to determine whether the jury clearly lost its way in reviewing that evidence. Second, insofar as Hasbrouck alleges prejudicial error in the admission of certain evidence, we rejected that argument in connection with our disposition of his first assignment of error. Thus, we are unpersuaded by Hasbrouck's argument that his conviction was against the manifest weight of the evidence because the jury improperly considered certain evidence.

{¶ 52} Similarly, insofar as Hasbrouck argues the evidence demonstrated that serious provocation caused him to act under the influence of sudden passion or in a sudden fit of rage, we addressed this issue in discussing his fifth assignment of error. Therein, we found that no evidence reasonably demonstrated that J.B.'s actions sufficiently provoked Hasbrouck to act under the influence of sudden passion or a sudden fit of rage. As such, we reject this manifest weight argument premised on purported serious provocation.

{¶ 53} Finally, we address Hasbrouck's contention that his felonious assault conviction is against the manifest weight of the evidence because the jury clearly lost its way

in not believing his claim of self-defense. In Ohio, self-defense is an affirmative defense. *State v. Ross*, 2025-Ohio-2875, ¶ 23 (10th Dist.). To defeat Hasbrouck's claim of self-defense, the state was required to prove, beyond a reasonable doubt, any of the following: (1) Hasbrouck was at fault in creating the situation giving rise to the affray; or (2) Hasbrouck did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape; or (3) Hasbrouck violated a duty to retreat or avoid the danger. *State v. Khalif*, 2024-Ohio-2239, ¶ 59 (10th Dist.), citing *State v. Messenger*, 2021-Ohio-2044, ¶ 36 (10th Dist.), a*ff'd*, 2022-Ohio-4562, citing *State v. Carney*, 2020-Ohio-2691, ¶ 31 (10th Dist.), and *State v. Daley*, 2020-Ohio-4390, ¶ 39 (10th Dist.). There is no duty to retreat where the defendant was in a place he had a lawful right to be. *State v. Palmer*, 2024-Ohio-539, ¶ 23, citing R.C. 2901.09(B).

{¶ 54} Hasbrouck argues that the evidence showed that he acted in self-defense because he retreated and retrieved the knife and railroad spike to defend himself when J.B. approached him in a threatening manner. He further asserts that the evidence showed that, while he may have swung and missed J.B., J.B. struck back with disproportionate force, knocking him onto a vehicle. Then J.B. forced Hasbrouck to the ground and pinned him, causing Hasbrouck to defend himself with the knife, cutting J.B. These assertions are generally consistent with Hasbrouck's statements during his interview with detectives. At that interview, Hasbrouck indicated that he attacked J.B. with the knife and railroad spike he retrieved from his residence. He explained he took this action because J.B. threatened to "butcher" him, J.B. is a much larger man than him, and J.B. moved toward him in the street during the verbal confrontation. Significantly, however, he did not indicate that J.B. was armed or ever entered his property (where he retrieved the weapons), and he effectively conceded that he left his property and initiated the physical violence between them on the street.

{¶ 55} According to J.B.'s testimony, Hasbrouck initiated the verbal confrontation, yelling obscenities first at Beasley and then at him. In response to this confrontation, Hasbrouck retrieved weapons from his residence. And after he retrieved those weapons, he ran off his porch and attacked the unarmed J.B., who was still in the street. Beasley also described Hasbrouck as running off his porch, into the street, and lunging at J.B. J.B. further testified that, during the fight, Hasbrouck stabbed J.B. in the neck with the knife,

and he began to cut a geometric shape on J.B.'s chest. Thus, consistent with Hasbrouck's statements at the police interview, this evidence demonstrated that Hasbrouck, with weapons retrieved from his residence, physically attacked an unarmed J.B. in the street, during which Hasbrouck cut J.B.'s neck and chest. In sum, the evidence proving Hasbrouck did not act in self-defense was overwhelming.

**{¶ 56}** Based on our review of all the evidence, we cannot conclude the jury lost its way in resolving the evidentiary conflicts, rejecting Hasbrouck's claim of self-defense, and finding him guilty of felonious assault.

**{¶ 57}** For these reasons, we find Hasbrouck fails to demonstrate his conviction was against the manifest weight of the evidence. Accordingly, we overrule Hasbrouck's fourth assignment of error.

## IV. Disposition

**{¶ 58}** Having overruled all five of Hasbrouck's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BEATTY BLUNT and EDELSTEIN, JJ., concur.

————————————